[Cite as *State v. Montgomery*, 2013-Ohio-4509.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

STATE OF OHIO

     Plaintiff-Appellee

v.

RODERICK T. MONTGOMERY

     Defendant-Appellant

Appellate Case No.    25277

Trial Court Case No.   2010-CR-4099/3

(Criminal Appeal from
 Common Pleas Court)

. . . . . . . . . . .

O P I N I O N

Rendered on the 11th day of October, 2013.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by CARLEY J. INGRAM, Atty. Reg. No. 0020084, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
     Attorney for Plaintiff-Appellee

JEFFREY T. GRAMZA, Atty. Reg. No. 53392, 131 North Ludlow Street, Suite 1210, Dayton, Ohio 45402
     Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1}     Defendant-Appellant, Roderick T. Montgomery, appeals from his conviction and sentence on six counts of Aggravated Murder, six counts of Murder, two counts of Aggravated Robbery, two counts of Kidnapping, two counts of Felonious Assault, and two counts of Aggravated Burglary.   Following a jury trial, the trial court merged the convictions into one count of Aggravated Murder, one count of Aggravated Burglary, and two counts of Aggravated Robbery.   The court then sentenced Montgomery to a total prison term of 31 years to life.

{¶ 2}     Montgomery contends that the trial court committed reversible error in overruling his motion to suppress identification.   Montgomery further contends that the trial court  erred in refusing to grant a mistrial following prosecutorial misconduct.   In addition, Montgomery maintains that the verdict was not supported by sufficient evidence and was against the manifest weight of the evidence.   Finally, Montgomery argues that the trial court committed other unspecified errors that can be found in the record of this case.

{¶ 3}     We conclude that the trial court did not err in overruling the motion to suppress identification.   Even if the photo lineups were suggestive, the witness identifications were reliable under the totality of the circumstances.   Furthermore, the trial court did not err in refusing to grant a mistrial.   Even if one of the prosecutor's remarks improperly referred to matters outside the record, this isolated aberration did not so infect the trial as to deny Montgomery's right to due process.

{¶ 4}     We also conclude that the verdict was supported by sufficient evidence and was not against the manifest weight of the evidence.    And finally, we decline the invitation to search

the record for reversible error, as this is not the duty of appellate courts. Accordingly, the judgment of the trial court will be affirmed.

## I. Facts and Course of Proceedings

{¶ 5} This case arises from a home invasion that occurred on December 9, 2010, and resulted in the death of Patrick Hall. Earlier that evening, Demond Johnigan, Billy Johnson, and Devin Garrett were at a house on Oakridge Avenue, in Dayton, Ohio, discussing the potential robbery of a home reputed to contain money and "dope".

{¶ 6} Shortly thereafter, Devin's brother, Trammel, came in with a shotgun, and there was more conversation about the robbery. About twenty-five minutes later, two more men, Larry Crowder and Roderick Montgomery, arrived in a black conversion van that Montgomery was driving. After the last two men arrived, everyone went outside and got in the van. Johnson and Montgomery then went over what people were supposed to do. Montgomery said that when they arrived at the house, he would knock on the door. If no one answered, he was going to kick in the door. Then, they were supposed to look for the money and the "weed".

{¶ 7} The house in question was located on Hagan Avenue, at the corner of Hagan Avenue and Rossiter Drive, in Jefferson Township, Ohio. Initially, the men drove by the house to see if someone was there. Trammel looked in the windows and said he did not see anyone in the house. After parking on Dayton-Liberty Road, Johnigan, Trammel, Devin, and Montgomery went to the house. Johnson and Crowder stayed in the van. All the men were dressed in black, and all of them, other than Montgomery, wore some kind of mask or covering over their faces. Johnigan had on a bullet-proof vest. Montgomery had also given all the men latex gloves.

**{¶ 8}** When they arrived at the house, Trammel again looked in the windows. This time, he said that someone was in the house. It was around 9:00 p.m. Patrick Hall and his girlfriend, Mercedes D., were in the master bedroom, in bed. Mercedes' son, D.J., who was nine years old, was in the T.V. room watching television. Another child, a 13-year old daughter, was also in the house.

**{¶ 9}** Instead of knocking, Montgomery kicked in the front door and the men entered the house. When they went in, they saw D.J. standing there. Montgomery was holding a Glock 40 pistol and told D.J. to come to him. Montgomery then held the pistol to D.J.'s head.

**{¶ 10}** After hearing male voices, Mercedes woke Patrick up. Patrick then went to the bedroom door and called for D.J. several times. Finally, D.J. told Patrick that the men said to come out. During this time, Mercedes called 911 and also used her key fob to set off an alarm that was located in the dining room. Montgomery, Trammel, and Devin then went down a hallway to the bedrooms, taking D.J. with them. At that point, Johnigan was searching the dining room, looking for money and drugs and whatever else he could find.

**{¶ 11}** The master bedroom door was off its hinges, and Patrick was propping the door up against the frame. He was not able to hold the men back, and they burst into the bedroom. When the door fell down, Patrick ran into the master bathroom and shut the door. Two men went towards the bathroom door and the other man, who was not wearing a mask, came towards Mercedes. He grabbed her arm and told her to come and shut off the alarm. The light in the bedroom was on, and she was able to see his face. In addition, the hall and dining room lights were on.

**{¶ 12}** While Mercedes was in the dining room, she came face to face with the man

(later identified as Montgomery). Montgomery kept demanding money, and Mercedes replied that they did not have any money. This conversation lasted for a few minutes, during which Mercedes was able to observe Montgomery's face. Montgomery then grabbed Mercedes by her hair and pulled her down the hall. She was told to get on her knees and put her head between her legs.

{¶ 13} At some point during his search, Johnigan asked Montgomery for the pistol because he wanted to threaten Hall. Johnigan went down the hall to the master bedroom, where he saw Devin standing guard over a woman in the hallway. In the master bedroom, Trammel had Hall at gunpoint, asking him where everything was, and D.J. was on the bed. Johnigan pointed the pistol at Hall and yelled at him about the money. Hall kept saying there was no money.

{¶ 14} According to Johnigan, Hall lunged at him, and he shot Hall. When Hall attempted to get back up, Johnigan shot him again. Johnigan then ran out of the bedroom and went into an enclosed patio, but could not find a way out. After running back into the house, Johnigan went to a window in the kitchen area, pushed out a screen, and escaped out the window into the backyard.

{¶ 15} When Johnigan got out to the street, he found the others standing on the sidewalk on Rossiter Drive. After seeing a white car pulling up on the east side of Rossiter, about three houses north of the house they had broken into, the men ran up to rob the occupant of the car (Roger Morgan). Johnigan ran up to the driver's side of the car, put his gun in Morgan's face, and demanded that Morgan give him everything. Morgan handed Johnigan his wallet, but it was empty, and Johnigan threw it down. While this was happening, Montgomery was standing

on the sidewalk, talking on a walkie-talkie. Johnigan had also previously seen Johnson with a walkie-talkie.

{¶ 16} The van then arrived to pick the men up. They drove back to the house on Oakridge, where Johnigan gave the gun to Johnson, and everyone dispersed. Johnigan was the last to leave. He rode around, but returned to Oakridge later the same night, because Johnson had called and said he needed to come back because the victim had died.

{¶ 17} When the police arrived at the Hagan address, they found a male lying face down, partially inside the bathroom and partially inside the master bedroom. They also found signs of a forced entry, a disarmed alarm, and a screen on the ground outside an open window. A little snow was on the ground, and there were tracks or footprints in the rear of the residence, leading away from the house.

{¶ 18} Montgomery County Sheriff's Detective, Brad Daugherty, obtained a statement that night from Mercedes, who was very upset. However, she was able to provide a description of the assailants. She stated that one was not wearing a mask, and was a heavy-set African-American male with a round face and gold-lined teeth. Mercedes described the other individuals as younger African-American males, who were thin, and were wearing masks.

{¶ 19} Subsequently, on December 16, 2010, Johnigan was arrested on an unrelated charge. While in custody, Johnigan told Detective Daugherty about his involvement in Hall's homicide and the involvement of other people. Johnigan also admitted that he had shot and killed Hall.

{¶ 20} After speaking with Johnigan, Daugherty compiled photo spreads using a computer program to generate a blind photo spread. Daugherty used Montgomery's latest

book-in photo from the county jail and entered parameters like height, weight, and race. Various matches resulted, and Daugherty narrowed them to five, selecting individuals similar to Montgomery, based on hairstyle, facial hair, and so on. The computer then randomly placed the photos in a six-person lineup. In the photo spread, Montgomery was the only one of the six suspects whose teeth showed. Montgomery had a slight smile and it appeared as if something were on his teeth, either some type of dental appliance or some type of metal.

{¶ 21} After compiling the photo lineup, Daugherty asked Detective Plummer to act as a blind administrator. Plummer then showed the photo spread to Mercedes on December 16, 2010. Mercedes stated that she was 1000% sure photos 1, 2, 4, 5, and 6 were not the suspect. She then pointed to No. 3 (which was Montgomery), and said that he definitely resembled the man who had forced her to turn off the alarm and had dragged her around the house by her hair. She stated that she was 85% sure of her identification.

{¶ 22} At trial, Mercedes stated that she had not been affected by the fact that Montgomery's teeth were showing. She said she knew it was the suspect when she saw his photo. She also expressed no doubt in her identification at trial, based on seeing Montgomery face-to-face, rather than in a one-dimensional photograph.

{¶ 23} Montgomery had solid gold teeth, rather than "gold-lined" teeth as described by Mercedes on the night of the incident. Montgomery also had solid gold teeth for a number of years before the home invasion.

{¶ 24} On December 20, 2010, the police also showed photo spreads to D.J. Again, a blind administrator was used, and the photos were randomly generated so that Montgomery's picture was in a different position than it had occupied in the photo spread shown to Mercedes.

{¶ 25}    D.J. identified Montgomery, who was in position No. 5 on the spread, as the person who "had the other gun."  Transcript of Proceedings, Volume III, p. 498.  D.J. said he was sure.  In addition, D.J. identified Montgomery at trial.  During the blind administration, D.J. was also shown other photo spreads, and selected Johnigan as the person who had shot Hall.  D.J. was in the master bedroom when Hall was shot, and said he had no doubt about his selection of Johnigan's photo.

{¶ 26}    Another blind administration was done in connection with Morgan, who was the victim of the car robbery.  Morgan identified Johnigan as the man who had robbed him.  Morgan seemed very confident of his identification of Johnigan.  Morgan was not able to identify any other individuals, because they were at a distance and he was not sure what the other individuals looked like.

{¶ 27}    Shortly after the photo identification, Montgomery was arrested and was indicted on the charges indicated above.  Montgomery subsequently filed a motion to suppress the photo identification, contending that it was impermissibly suggestive and gave rise to a substantial likelihood of misidentification.  After holding two hearings, the trial court overruled the motion.  The court concluded that the procedure was not so unnecessarily suggestive as to give rise to a very substantial likelihood of misidentification, and that the challenged identification was reliable.  The matter then proceeded to a jury trial, and Montgomery was found guilty as charged.   Montgomery appeals from his conviction and sentence.

## II.   Did the Trial Court Err in Overruling the Motion to Suppress?

{¶ 28}    Montgomery's First Assignment of Error is as follows:

The Trial Court Committed Reversible Error in Overruling Appellant's

Motion to Suppress Identification.

{¶ 29}    Under this assignment of error, Montgomery contends that an impermissibly suggestive procedure led to a very high likelihood of misidentification by the eyewitnesses.   In this regard, Montgomery focuses on the fact that Mercedes told the police that the suspect had "gold-lined" teeth, not solid gold teeth, and that the description does not match Montgomery's actual teeth.   Montgomery also notes that the gold in the photo spread was noticeable, but it was not readily apparent whether the gold was solid or outlined.   According to Montgomery, this made the lineup with only one person highlighted   impermissibly suggestive, and led to mistaken identification.

{¶ 30}    After holding a hearing, the trial court concluded that the process was unnecessarily suggestive because Montgomery was the only individual who was depicted with his lips spread.   Although there is no specific support of this in the record, the court stated that the detectives did not have to use this particular photograph, and that the Montgomery County Jail photo databank contained other photographs of Montgomery that did not show his teeth. Because Montgomery met his initial burden, the court set a further hearing where the eyewitnesses testified.   After hearing the eyewitness testimony, the trial court concluded that the evidence was reliable and could be admitted.

{¶ 31}    " 'When a witness has been confronted with a suspect before trial, due process requires a court to suppress her identification of the suspect if the confrontation was unnecessarily suggestive of the suspect's guilt *and* the identification was unreliable under all the circumstances.' " (Emphasis sic.)  *State v. Murphy*, 91 Ohio St.3d 516, 534, 747 N.E.2d 765

(2001), quoting *State v. Waddy*, 63 Ohio St.3d 424, 438, 588 N.E.2d 819 (1992). "In other words, even if an identification procedure was overly suggestive, the identification remains admissible if sufficient evidence of reliability exists." (Citations omitted.) *State v. Taylor*, 2d Dist. Montgomery No. 22232, 2008-Ohio-6048, ¶ 12.

**{¶ 32}** Montgomery suggests that we should review the photo spread, and we have done so. Although Montgomery's mouth is slightly open, in contrast to the other men shown, it is nearly impossible to tell what he has in his mouth. There is only a slight glint to suggest that the items shown are something other than his teeth. However, in evaluating the trial court's decision, we will assume that the trial court was correct in holding that the confrontation was unnecessarily suggestive. The issue, then, is whether there is sufficient evidence of reliability.

**{¶ 33}** To assess this issue, courts look at "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). "[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.* at 199-200.

**{¶ 34}** After reviewing the evidence, we conclude that Mercedes' identification was reliable. Her testimony indicates that she had a good opportunity to observe the suspect's face at the time of the crime. She saw him in well-lit conditions, on more than one occasion, and for a substantial period of time when they were face-to-face. The circumstances were also such that

she would have been paying a high degree of attention. Mercedes' prior description of the suspect was accurate in all details other than the gold outline of his teeth as opposed to solid gold, as she accurately described his race and the fact that he was heavy-set and had a round face. She was quite sure that Montgomery was the man she had seen, and only one week had elapsed between the home invasion and the identification.

{¶ 35} D.J.'s identification was also reliable under the totality of the circumstances. D.J. came face-to-face with the suspects when they entered the house. He was very close to Montgomery, and his attention would have been riveted on the person who was holding a gun to his head. D.J. also had an opportunity to observe Montgomery when they went to the master bedroom, which was well-lit. D.J. testified that he got a good look at Montgomery, and that when he saw Montgomery's eyes, he was really close to him. Montgomery's eyes also were one factor that helped D.J. identify him. In addition, the photo lineup occurred only about eleven days after the incident, and D.J. picked out Montgomery within a matter of seconds. He also said he was sure of the identification.

{¶ 36} After reviewing the evidence, we conclude that it was sufficiently reliable to be presented to the jury, and the trial court did not err in refusing to suppress the evidence.

{¶ 37} Montgomery's First Assignment of Error is overruled.

## III. Did the Trial Court Err in Overruling the Motion for Mistrial?

{¶ 38} Montgomery's Second Assignment of Error states that:

The Trial Court Committed Reversible Error When It Overruled

Appellant's Motion for Mistrial After the Government's Counsel Committed Prosecutorial Misconduct in His Closing Argument, Depriving Appellant of His Right to a Fair Trial, a Right Guaranteed by the Fifth and Fourteenth Amendments to the U.S. Constitution and by Article I, Section 10 of the Ohio Constitution.

**{¶ 39}** Under this assignment of error, Montgomery contends that the State committed prosecutorial misconduct by telling the jury during the second closing argument about the content of Johnigan's statement when he was taken into custody by the police. According to Montgomery, this improperly boosted Johnigan's credibility. Montgomery contends that the State's misconduct was made even more egregious by the State's prior acknowledgment that it could not present the content of Johnigan's statement as evidence.

**{¶ 40}** The Supreme Court of Ohio has long held that " '[p]rosecutors are entitled to latitude as to what the evidence has shown and what inferences can be drawn therefrom.' " *State v. Ballew*, 76 Ohio St.3d 244, 255, 667 N.E.2d 369 (1996), quoting *State v. Richey*, 64 Ohio St.3d 353, 362, 595 N.E.2d 915 (1992). (Other citation omitted.) "The closing argument must be reviewed in its entirety to determine prejudicial error." (Citations omitted.) *Id.*

**{¶ 41}** In *State v. Jeffery*, 2013-Ohio-504, 986 N.E.2d 1093 (2d Dist.), we also noted that:

> The test for prosecutorial misconduct is whether the remarks were improper, and if so, whether they prejudicially affected the accused's substantial rights. *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78

(1982). The question is whether the prosecutor's misconduct so infected the accused's trial with unfairness that the accused's convictions came in violation of the right to due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 644, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). *Jeffery* at ¶ 15.

**{¶ 42}** The first consideration, thus, is whether the remarks were improper. In this regard, we note the following context for the State's remarks. First, Johnigan testified at trial that he had pled guilty to Aggravated Murder, two counts of Aggravated Burglary, and two counts of Kidnapping as the result of a plea agreement with the State. As part of the agreement, Johnigan would receive a specific sentence and was required to truthfully testify about the home invasion.

**{¶ 43}** At trial, Johnigan also testified that he was picked up by the police on December 16, 2010, and was questioned about the home invasion. Johnigan said that he told Detective Daugherty about his involvement in the incident and about who had been with him that night. In addition, Johnigan testiifed that he had admitted to shooting and killing Hall. During his testimony, Johnigan further stated that Montgomery and Johnson were in charge, and went over what everyone was supposed to do. And, of course, Johnigan implicated Montgomery during his testimony as having been part of the actual home invasion.

**{¶ 44}** The State also presented testimony from Detective Daugherty at trial. Daugherty testified about Johnigan's pre-interview form, which was filled out at around 6:25 p.m. on December 16, 2010. Daugherty stated that Johnigan had told him during the interview of his involvement in the Hagan homicide and the involvement of other people. At that point, the defense objected, based on its belief that Daugherty intended to testify about what Johnigan

had said during the interview. However, the State's attorney represented that he was not going to elicit Johnigan's statements. In this regard, the following exchange occurred:

THE COURT: You're not going to elicit Johnigan's statements?

MR. DESCHLER: No.

MR. GRAMZA: Oh, You're not going to get into the content of the statement?

MR. DESCHLER: I can't.

MR. GRAMZA: Okay. That's what I was asking, because when you said any involvement of others, I thought you were about to get into that, and I'm going to stop it before it came out, because I know what Johnigan told the detective in homicide. Transcript of Proceedings, Volume IV, pp. 642-643.

{¶ 45} Subsequently, during closing arguments, the defense argued that Montgomery had been wrongly identified. Specifically, defense counsel made the following statements:

Secondly, identification, they got the wrong guy, folks. They got the wrong guy. We have Mr. Johnigan testifying that Mr. Montgomery did these things, went along with him on this night where these crimes were committed. And we have Ms. D* * * and the young man * * * [D.J.]. Those are the people that identified him. With the identifications from the people at the scene, as questionable as they are, are we even sitting here if we don't have Mr. Johnigan as well?

But we do have Mr. Johnigan. And why we got him, you heard the evidence. He's getting a plea deal. It's not secret. It's out there.

Now, admittedly, the evidence shows he is arrested. He signs a waiver of rights forms and talks to police. Eventually, the police develop a suspect, Mr. Montgomery. Now, that's what you've heard from that witness stand as to how he became a suspect. Now, I'm not going to imply anything as to what was said. You have that, and then you have the story. You have a deal that was struck, however much later, a year and three months later, and there's the shooter talking about what he did and pointing a finger at that man.

So you have him talking about it. Do you dismiss his testimony as motivated by that impure motive? Maybe. Again, you all decide that. Is there any other reason to believe him? Anyone corroborating what he says? He says he was there, but he's admitting his responsibility. Transcript of Proceedings, Volume V, pp. 903-904.

{¶ 46} On rebuttal, the State's counsel made the following comments:

And it brings us – I also want to talk about Mr. Johnigan, a couple of things here. Apparently, I don't know, there was something about, well, he got a plea deal recently, this month, actually, so therefore you can't believe what he's saying, even though he told the police back on December 16th of 2010, of what he saw, what he was involved in and who all were involved in it. And he told them, at this point, that this guy was one of the ringleaders. So the police put together a police spread, and apparently you can't believe –. *Id.* at pp. 929-930.

{¶ 47} At that point, the defense objected and asked the trial court to strike the prosecutor's remarks, based on the fact that Johnigan's prior statement was not in evidence. The

trial court then instructed the jury to disregard what the State had said about Johnigan's statement on December 16, 2010, when Johnigan was interviewed by the detective. Immediately thereafter, the State's attorney said to the jury:

That is correct. If I misspoke and I said that Johnigan had told the police that back then, I misspoke. What I meant to say was that Johnigan came in here and told you what he did that night. And he gave a statement to the police that night, okay. So that's what I meant to say and that's what he did. He came in here and told you of his involvement in the home invasion. And he told you of the involvement of the other people in the home invasion, okay. So you have his statements in conjunction with the two eyewitnesses. And, once again, think how much they corroborate and how consistent they are together, the three perspectives. *Id.* at p. 934.

**{¶ 48}** Defense counsel again objected, but the trial court overruled the objection. The court concluded that the State's latter remarks referenced what Johnigan said at trial, not what Johnigan had said during his interview with the police.

**{¶ 49}** In deciding if remarks are improper and, if so, whether they prejudiced the defendant, appellate courts consider several factors: " '(1) the nature of the remarks, (2) whether an objection was made by counsel, (3) whether corrective instructions were given by the court, and (4) the strength of the evidence against the defendant.' " *State v. Croom*, 2d Dist. No. Montgomery 25094, 2013-Ohio-3377, ¶ 82, quoting *State v. Braxton*, 102 Ohio App.3d 28, 41, 656 N.E.2d 970 (8th Dist.1995).

**{¶ 50}** After reviewing the record, we conclude that the State did improperly refer to

matters not in evidence, i.e., that Johnigan had said during his police interview that Montgomery was a ringleader. This is somewhat troubling in light of the State's prior admission that it could not present evidence about what Johnigan said to the police when he gave his initial statement. However, this isolated aberration did not so infect the trial that Montgomery's convictions violated his right to due process.

{¶ 51} In this regard, the Supreme Court of Ohio has stressed that " '[i]f every remark made by counsel outside of the testimony were ground for a reversal, comparatively few verdicts would stand, since in the ardor of advocacy, and in the excitement of trial, even the most experienced of counsel are occasionally carried away by this temptation.' " *State v. Maurer*, 15 Ohio St.3d 239, 267, 473 N.E.2d 768 (1984), quoting *Dunlop v. United States*, 165 U.S. 487, 498, 17 S.Ct. 375, 41 L.Ed. 799 (1987).

{¶ 52} The prosecutor's comment, itself, was mild compared to other remarks that have been found objectionable. For example, in *Smith*, the court found prejudice where "the assistant prosecutor referred to defense evidence as 'lies,' 'garbage,' 'garbage lies,' '[a] smoke screen,' and 'a well conceived and well rehearsed lie[,]' " and "intimated that defense counsel had suborned perjury by manufacturing, conceiving and fashioning lies to be presented in court." *Smith*, 14 Ohio St.3d at 14, 470 N.E.2d 883.

{¶ 53} We note that after Montgomery's objection, the trial court did instruct the jury to disregard the prosecutor's remarks. And finally, despite Montgomery's protests, the evidence against him was strong.

{¶ 54} Although Johnigan's testimony resulted from a plea bargain, that does not mean that his testimony was untruthful. To the contrary, the details of Johnigan's testimony are

consistent with, and are corroborated by, the physical evidence at the scene and the testimony of other witnesses. For example, the placement of the window screen and the footprints leading away from the house corroborate Johnigan's account of how he left the premises. D.J. and Morgan also both picked Johnigan's photo from the photo spreads. D.J. identified Johnigan as the man who shot Hall, and Morgan identified Johnigan as the person who accosted him at gunpoint and stole his wallet. These facts are consistent with Johnigan's testimony. Furthermore, a walkie-talkie was found during a search of Montgomery's van, which, again, is consistent with Johnigan's testimony that Montgomery had a walkie-talkie that night.

{¶ 55} In addition, Johnigan identified the van that Montgomery was driving. This information would have been unknown to Johnigan had Montgomery not been present, since Johnigan also testified that he had not met Montgomery before the night of the invasion. And, of course, we have already concluded that the eye-witness identification is reliable.

{¶ 56} In arguing that the evidence was unfairly prejudicial, Montgomery notes that in addition to making the ringleader statement, the prosecutor said that Johnigan had told the police that Montgomery was one of the perpetrators of the crimes. However, this is not what the prosecutor said. Instead, the prosecutor stated that Johnigan told the police during his interview about who was involved. This was an accurate statement.

{¶ 57} Johnigan testified at trial that he told the police who he was with the night of the home invasion. No objection was made to this testimony. In addition, Detective Daugherty testified that Johnigan told him about his involvement in the Hagan homicide and the involvement of other people.

{¶ 58} Daugherty also testified that he made a photo spread after speaking with

Johnigan. The photo spread included Montgomery's picture. On the same day, Daugherty presented the photo spread to a victim of the home invasion. In view of this testimony, the jury easily could have inferred that Johnigan had implicated Montgomery during his interview.

{¶ 59} Accordingly, although the prosecutor should have refrained from referring to matters not in evidence, the trial was not so infected as to deny Montgomery's right to due process.

{¶ 60} Montgomery's Second Assignment of Error is overruled.


IV. Was the Verdict Against the Manifest Weight of the Evidence

or Unsupported by Sufficient Evidence?

{¶ 61} Montgomery's Third Assignment of Error states that:

The Jury Verdict Was Against the Manifest Weight of the Evidence, and the Evidence Presented Was Insufficient, as a Matter of Law, to Prove the Appellant's Guilt Beyond a Reasonable Doubt.

{¶ 62} Under this assignment of error, Montgomery contends that the evidence was insufficient as a matter of law because the government failed to present sufficient evidence that he was the person who committed the home invasion. Montgomery also maintains that his convictions were against the manifest weight of the evidence, based on the entire record of the case. The standards for deciding these issues are well-settled.

{¶ 63} "A sufficiency-of-the-evidence argument challenges whether the state has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law." *State v. Cherry*, 171 Ohio App.3d 375,

2007-Ohio-2133, 870 N.E.2d 808, ¶ 9 (2d Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "The proper test to apply to the inquiry is the one set forth in paragraph two of the syllabus of *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492: 'An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *Cherry* at ¶ 9.

**{¶ 64}** In contrast, "[w]hen a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Hill*, 2d Dist. Montgomery No. 25172, 2013-Ohio-717, ¶ 8, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "A judgment should be reversed as being against the manifest weight of the evidence 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶ 65}** "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency."

(Citation omitted.)  *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11.

 Consequently, "a determination that a conviction is supported by the weight of the evidence will

also be dispositive of the issue of sufficiency."  (Citations omitted.)  *State v.  Braxton*, 10th

Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15.

{¶ 66}  We have reviewed the entire record, and conclude that the conviction is

supported by sufficient evidence and is not against the manifest weight of the evidence.

Montgomery was identified and was placed at the scene by three eye-witnesses, whose testimony

was reliable.  As we discussed, the evidence against Montgomery was strong. This is not the

exceptional case in which the evidence weighs heavily against the conviction.  Accordingly, the

Third Assignment of Error is overruled.

V.  Does the Record Portray Other Reversible Error?

{¶ 67}  Montgomery's Fourth Assignment of Error states as follows:

The Trial Court Committed Reversible Error in Any Other Errors That Are

Not Set Forth in the Foregoing That Can Nonetheless Be Found in the Record of

This Case.

{¶ 68}  Montgomery has not included any specific assignments of error or argument

under this assignment of error, but asks us to search the record for other errors that are reversible.

 We decline the invitation.  App.R. 16(A)(3) requires an appellant's brief to contain "[a]

statement of the assignments of error presented for review, with reference to the place in the

record where each error is reflected."  In addition, App.R. 16(A) (7) requires appellants to

present "[a]n argument containing the contentions of the appellant with respect to each

assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies."

{¶ 69}    "It is not the duty of an appellate court to search the record for evidence to support an appellant's argument as to any alleged error."  (Citation omitted.)  *State v. Watson*, 126 Ohio App.3d 316, 321, 710 N.E.2d 340 (12th Dist.1998).  *Accord Barry v. Barry*, 2d Dist. Montgomery No. 25387, 2013-Ohio-181, ¶ 8-9.

{¶ 70}    Based on the preceding discussion, Montgomery's Fourth Assignment of Error is overruled.


## VI.  Conclusion

{¶ 71}    All of Montgomery's assignments of error having been overruled, the judgment of the trial court is affirmed.


. . . . . . . . . . . .

DONOVAN and FROELICH, JJ.,   concur.



Copies mailed to:

Mathias H. Heck
Carley J. Ingram
Jeffrey T. Gramza
Hon. Timothy N. O'Connell