[Cite as *State v. Brown*, 2017-Ohio-8416.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case No. 2016-CA-53 |
| | : | |
| v. | : | Trial Court Case Nos. 2015-CR-573 |
| | : | and 2016-CR-188 |
| LARRY C. BROWN, JR. | : | |
| | : | (Criminal Appeal from |
| *Defendant-Appellant* | : | Common Pleas Court) |
| | : | |

. . . . . . . . . . 

O P I N I O N

Rendered on the 3rd day of November, 2017.

. . . . . . . . . . 

ELIZABETH L. MCCORMICK, Atty. Reg. No. 0087862, Assistant Prosecuting Attorney, Clark County Prosecutor's Office, 50 East Columbia Street, Fourth Floor, Springfield, Ohio 45502
        Attorney for Plaintiff-Appellee

CARLO C. MCGINNIS, Atty. Reg. No. 0019540, 55 Park Avenue, Oakwood, Ohio 45419
        Attorney for Defendant-Appellant

. . . . . . . . . . . . 

TUCKER, J.

**{¶ 1}** Defendant-appellant Larry Brown appeals from his conviction and sentence for felonious assault and tampering with evidence. Brown contends that the State did not present evidence sufficient to sustain the convictions and that the convictions are against the manifest weight of the evidence. Brown also asserts that the State did not establish venue regarding the felonious assault charge. He further contends that he was denied a fair trial because the State failed to investigate and preserve exculpatory evidence, the prosecutor acted improperly during trial, and counsel was ineffective. Brown also claims that the sentences are not supported by the record. Finally, Brown contends that the doctrine of cumulative error requires that his convictions be reversed. For the reasons set forth below, we affirm.

## I. Facts and Procedural History

**{¶ 2}** On July 31, 2015, Springfield Fire Department paramedics and Springfield Police Department officers were dispatched to 643 Villa Road, Apartment J, following a 9:05 a.m. call to 911. At the scene, Dawn Howard was discovered on the floor of her apartment bedroom. Brown was in the room with her. Howard was badly injured and was transported to Miami Valley Hospital. Following an investigation, Brown was indicted on one count of felonious assault in violation of R.C. 2903.11(A)(1). He was subsequently indicted on one count of tampering with evidence in violation of R.C. 2921.12(A)(1). The State filed a bill of particulars in both cases. In the felonious assault case, the bill of particulars indicated that Brown struck Howard with his vehicle. In the bill of particulars for the charge of tampering with evidence the State indicated that Brown

bathed Howard before calling 911 despite his claim that he thought she had been beaten and raped. The cases were consolidated, and proceeded to a jury trial. Trial was conducted July 20 through July 22, 2016.

{¶ 3} At trial, the State presented a recording of the 911 call. During the call, Brown identified himself as Howard's boyfriend. He stated that, approximately fifteen to twenty minutes before he made the call, he had entered her apartment and found her naked on the floor of her bedroom. He stated that she appeared to have been molested. He informed the 911 operator that Howard was not unconscious, but that she was not "sentient." He indicated that he had tried to get her dressed, but was unable to fully clothe her. He stated that he last saw Howard the prior evening. Brown indicated that Howard had severe bruising and was "so beat up." He noted that she had ligature marks on her wrists. He asked the 911 operator whether he should dress Howard. The operator told him not to touch Howard, to which Brown responded, "I've got to touch her, she's mine." The paramedics arrived on the scene at 9:13 a.m., and can be heard on the 911 tape asking Brown when he had found Howard. Brown informed them that he had found her an hour before. A paramedic asked why Brown did not call 911 sooner. Brown did not respond. But he informed the paramedics that he had taken Howard into the bathroom and bathed her prior to calling 911.

{¶ 4} The State presented the testimony of Gregory Sneed, a Springfield Fire Department paramedic who responded to Howard's apartment. Sneed testified that he called out several times when he entered the apartment, but no one responded. Sneed testified that he entered the bedroom where he observed Howard on the floor at the foot of the bed and Brown standing by her head. Sneed testified that Howard was one of the

"most injured" people he had ever observed, and that he thought she would die. He testified that she was on her back on the floor with her head drawn to the right. He noted that she was partially wet and only partially clothed. Sneed testified that Howard's feet were "posturing," or pointing down, which is an indication of severe brain injury. He further testified that she had bruising and swelling of her face, that her eyes were swollen shut, and that the bruising around her eyes was dark indicating that it was a couple of hours old. According to Sneed, Howard's torso, arms, and legs had multiple abrasions, scratches and bruises. Sneed testified that Howard did not respond to his questions, but moaned when he touched her. Sneed testified that Brown appeared unemotional, and informed the paramedics that he had found her an hour before they arrived. When Sneed asked why Brown waited so long to call, he received no response. Sneed noted clothing a few feet away that appeared to have blood on it. Sneed testified that he asked Brown to leave the room, but Brown kept reentering. Sneed testified that the police arrived three minutes after he did.

{¶ 5} Springfield Police Department Officer Jimmy Cosby also testified for the State. He stated that he arrived on the scene when the paramedics were placing Howard onto a backboard. He testified that he spoke to Brown who indicated that he had been dating Howard for three to four months. Cosby testified that Brown informed him that he had followed Howard home from work the day before at approximately 6 p.m. According to Cosby, Brown stated that he watched Howard enter her apartment and that he then left to go home. Cosby testified that Brown denied any contact with Howard for the rest of the night until he returned to the apartment at 8:20 the next morning. Cosby testified that Brown stated he used his key to let himself into Howard's apartment where he

proceeded to make coffee. Cosby testified that Brown stated he then found Howard on the floor of her bedroom, and that he showered her, put her back on the floor, dried her, and then clothed her. Brown informed Cosby that he called Howard's father after which he called 911. Cosby testified that he observed blood on the bedroom carpet and the rug by the bed. He also noticed some very dirty clothes. Cosby noted that he saw two small holes in the wall of the living room, but no signs of any struggle. He testified that Brown stated that Howard had been beaten. Cosby testified that Brown referred to Howard as his "soul mate," and "the love of his life." When Cosby asked Brown why he showered Howard, he stated that he did not know and that he "probably shouldn't have done that."

{¶ 6} Springfield Police Detective Trent King also arrived on the scene a few minutes after the paramedics. King took Brown out on the patio where he proceeded to take Brown's statement. King first asked Brown if he owned a blue pickup truck parked near the apartment, and if so, how it had acquired damage observed on the right front. Brown acknowledged that the truck was his, and stated that he ran into a fence near his father's home at approximately 7 p.m. the prior evening. Brown then stated that he "did everything wrong this morning." He informed King that he came into Howard's apartment and made coffee. He stated that he then found Howard on the floor. Brown informed the police that Howard's estranged husband is a "large" man who "gives her grief." Brown stated that he had once spoken to the husband and told the husband he "wanted him to let her go so I could have her." Brown stated that the husband was not very pleasant during the conversation.

{¶ 7} Brown informed King that he last saw Howard at approximately 6:15 the

previous evening. He stated that he had followed her home from work because "there's so many men that make her uncomfortable that I try to be in her orbit as close as I possibly can as much as she'll let me so that she does not have to worry about that." He then stated that one of those men works at the same carwash facility as Howard. Brown stated that he accompanied Howard home from work every day. He stated that on July 30, he followed her home and went into the apartment to show Howard that he had done all of her chores, such as laundry, to show her how a "good boyfriend treats you." He then said that Howard had a 15-year abusive relationship with her husband, and that she was on the phone with the husband while Brown was in the apartment. Brown said that Howard was "despondent" after the call. He stated that he was in the apartment for about 25 minutes. Brown denied having sex with Howard. Brown denied having any further contact with Howard that night.

{¶ 8} Brown informed King that he arrived at Howard's apartment at about 8:00 a.m. the following day. He stated that when he found her, he called her dad, cleaned her, and tried to communicate with her. Brown stated that she made noises that made him think her jaw was broken. When asked what he thought had happened to Howard, Brown stated that she is a "heavy drinker," and that she "puts [her]self in dangerous situations."

{¶ 9} Detective James McCutcheon testified that Brown was taken to the police department where pictures were taken of injuries to his right ear and cheek.

{¶ 10} Mike Parsons, a Springfield Police officer, testified that he processed the apartment and truck for evidence. He testified that he found keys in the door to the apartment. He further testified that there was no evidence of forced entry. Parsons

testified that there were two holes in the living room wall with debris, apparently from the holes being created, on the floor underneath each hole. Parsons testified that the apartment was neat, orderly and clean, with the exception of the bathroom and the debris from the holes. He further testified that there was no sign of a struggle. Parsons testified that he found a piece of grass straw on the hallway floor outside the bathroom, and that there was straw in the bedroom. Parsons testified that he collected a pair of women's shorts and panties that were wet with urine. He also collected a bra and tank top that were very dirty and appeared to have bloodstains. Parsons testified that a hammer was found in Brown's truck. Parsons testified that there was a piece of straw on the hood of the truck that had a piece of hair attached to it. The straw had what appeared to be blood on it, and it was near a smudge of blood found on the truck's hood.

{¶ 11} Bryan White, a special agent with the Ohio Bureau of Criminal Investigation (BCI), testified that he helped process evidence from the pickup truck. He testified that he initially noticed damage to the front passenger side of the vehicle. White testified that the truck had damage from the bottom of the headlight down past the bumper, and that there was debris on the light and bumper that had the consistency of wood or bark. There was damage to the plastic lens of the headlight which was not in its normal position. There were also wires hanging from the damaged headlight. The wheel well on the right front passenger side also showed damage. White testified that the rear tire was deformed with a portion of the rubber missing from around the side wall of the tire. White testified that he also found a bucket and a looped piece of rope in the truck bed, as well as a hammer, sandal and piece of straw inside the truck cab. He said that he tested the stain on the rope which was presumptively positive for blood.

{¶ 12} White also testified that he found red stains in numerous places. He testified that he performed a test for blood on the stains, and that they all came back as being, presumptively, blood. On the exterior of the truck he documented stains on the front grill, the hood, three separate spots in the bed area, the rear passenger side, and the driver's side near the tail light. On the interior, he documented spots on the driver's door trim, the center console, the back side of the driver's headrest, the glove box, the floor and floor mat of the front passenger seat, the front passenger seat, the rear of the front passenger seat, and the front license plate. He testified that he took 17 swabs of suspected blood from the truck.

{¶ 13} Katharine Hall, a forensic scientist in DNA with BCI, testified that samples from a rape kit revealed that Brown's sperm was found in Howard's vagina. She further testified that only three of the swabs from the truck were tested for DNA. The test found that Howard's blood was on all three samples which were taken from the pickup's grille, the passenger seat, and the truck bed.

{¶ 14} The owner of Fast Lane Wash & Lube, John Cotter, also testified for the State. Cotter testified that Howard had worked for him for about 15 years. He testified that "a lot of times [Brown] would stop [at the carwash] in the morning, give her coffee or cigarettes, might stop and see her throughout the day." Cotter testified that Howard was working on July 30, and that he observed Brown arrive at the carwash at approximately 5:45, and that Brown sat waiting for Howard to get off work. Cotter testified that he observed Brown's blue Dodge pickup at that time, and that it was clean and had no damage. He noted that the truck had gone through the carwash that week.

{¶ 15} Springfield Detective Ronald Jordan testified that he was involved in the

investigation of the case. He filed a report noting that he contacted Howard's father, Eugene Buskirk. Buskirk stated that Brown had called him and indicated that Howard was injured. Brown informed Buskirk that Howard and he had been at the Ole Brick Tavern the previous night.

{¶ 16} Jordan testified that he went to the Ole Brick Tavern, a bar in Clark County, to review surveillance videotapes. He testified that he met with the owner of the bar and reviewed footage from video cameras located both inside and outside of the bar. Jordan testified that the staff was able to help him narrow down the time frame that Howard and Brown were in the bar. He testified that he then searched the videos, and beginning at the 8:30 p.m. mark observed the couple on tapes from cameras 12 and 14. These cameras show the actual bar from different angles. He also looked at the camera focused on the front patio where there are picnic tables, but did not observe either Howard or Brown. He additionally viewed the parking lot camera but did not see the couple or either of their cars. He further testified that he did not observe the couple leave the bar. Finally, he testified that he used a flash drive to copy the footage that depicted the couple.

{¶ 17} The owner of the bar, Marsha Beverly, testified that she met with Jordan and watched the videotapes with him. She testified that she remembered viewing footage from all of the cameras for the relevant time frame. She testified that the parking lot camera was not clear because it did not show the cars well after dark. She further stated that some of the other cameras in the bar do not get much movement, and thus, are not activated all the time.

{¶ 18} Dawn Fletcher testified that she was working at the Ole Brick Tavern on July 30. She testified that she noted Howard and Brown because they were both

intoxicated, and eventually had to be cut off from purchasing any more alcohol. Fletcher testified that Howard climbed up on the bar during the evening and began to dance provocatively in front of another man. She testified that Brown did not appear happy, and that there was hostility in his voice when he conversed with the man. She testified that the conversation drew her attention because of the hostility. According to Fletcher she watches for that type of interaction in case a situation needs to be diffused.

{¶ 19} A review of the videotapes shows Howard climbing up onto the bar and dancing in front of a man seated at the bar. Brown can be observed walking up to the bar and extending his hand up to Howard. Brown then walked away from the bar. During the dance, which lasted six minutes, Howard placed her hands on the man's shoulders and thrust her pelvis toward him while the man held onto her ankles. Howard turned her back to the man at which point she began to bump his head with her buttocks. The man can be observed bumping back with his head. Brown walked up again, extended his hand to Howard, and walked away again. Howard put her leg on the man's shoulder at which point he touched her buttocks. Howard then slipped and began to fall off the bar. The man helped her down, the two hugged and kissed. Howard walked away. A few moments later she walked back up to the bar. She and the man began to talk at which point Brown walked back up and she and Brown walked away together. A few minutes later, Howard and Brown approached the bar again. Brown appears to push Howard away from the man. Then Brown and the man spoke to each other and Howard walked away. Howard then returned and kissed both men. She walked away again, and the two men continued talking. The men then hugged.

{¶ 20} Later Brown returned to the bar. He sat down beside the man and

engaged in what appears to be a heated disagreement. However, that too ends with the men hugging. The last time Howard and Brown are seen on tape is 9:15 p.m.

**{¶ 21}** Springfield Police Detective Daniel DeWine testified that he also responded to the scene and talked to Brown a couple of times. He asked Brown to show the police where he had wrecked his pickup truck, but Brown stated that he did not want to show them. DeWine further testified that a few days later the department received a call from Howard's husband indicating that he had found some evidence in her apartment. DeWine went back out to the apartment and found a handwritten note on a newsletter issued by the apartment complex. DeWine testified that the signature of the note matched the signature on Brown's driver's license. The note, which was admitted into evidence, read:

> My darling Dawn, it's 6 a.m. and I need to reach out to you in some way. Writing is all I have. I have loved you as no other. I cannot change the past or who I am. I am badly broken and have no idea how to fix it. I tried to see you, but they wouldn't let me. Things have gotten out of control and become so spun that I see no hope for the future. I honestly don't know what to do. Please don't hate me. You are a good woman who has suffered far too much already. I should have known that I would only cause you pain, but my love for you seemed to hide that somehow. Your love made me feel that there was hope that somehow life would be bearable for me again. I have no memory of what happened, but I am afraid that my life is over. I am out of options. I cleaned the apartment and washed and folded all your clothes. It seemed like the right thing to do. I hope you can

forgive me. I'm leaving my signed truck title and computer to do with as you will. I hope it helps. I truly do love you more than life itself. I'm sorry, but I must leave here now. Someday I will contact you. Love, Larry.

{¶ 22} Howard also appeared at trial. During questioning, she was unable to remember where she had lived, or where she currently lived. She could not remember how she was injured. And she was unable to recognize a picture of Brown taken at the time of the incident.

{¶ 23} Anita Pollack, the neurosurgeon on call when Howard presented to Miami Valley Hospital, also testified. She stated that she performed a left side decompressive craniotomy removing a portion of Howard's skull to give the brain room in case it swelled. She testified that Howard had a subdural hemorrhage. Howard's temporal muscle on the side of the head was very swollen indicating trauma. Also Howard suffered fractures to her nasal bone, jaw bone, orbital floor and a rib.

{¶ 24} According to Pollack, Howard suffered a stroke following surgery. She testified that at the time of trial, Howard remained wheelchair bound with diminished neurological functions. She also explained that Howard was still wearing a helmet because the portion of her skull that had been removed had not been replaced as of the date of the trial.

{¶ 25} Brown testified in his own defense. He indicated that he had dated Howard from February 2015 until the time of her injury. He then testified that he is an alcoholic, and has struggled with the problem for 25 years. He testified that he drinks until he "just can't drink anymore," and that he sometimes passes out and has blackouts.

{¶ 26} Brown testified that he remembered going to Howard's apartment on July

He testified that he did her chores and that he began drinking beer around noon. He testified that he went to the carwash that evening and waited until Howard got off work. He testified that his memory began to get hazy at that point, and that he could not remember anything that occurred after he left the carwash.

{¶ 27} He testified that when he found Howard the next morning he was still drunk and was in a panic. He testified that he was surprised when the police mentioned damage to his truck because he did not realize that it had been damaged. Asked why he told the police he had damaged the truck near his dad's home, Brown testified that he "superimposed another incident that took place years before out in Selma onto [the current damage] trying to make logic of that situation."

{¶ 28} Brown testified that he attempted to visit Howard while she was in the hospital, but was not permitted to see her. He further admitted he wrote the note that Howard's husband found in her apartment. He denied harming or intending to harm Howard.

{¶ 29} The jury convicted Brown on both charges. The trial court imposed a prison sentence of eight years for the felonious assault conviction and a sentence of three years on the tampering with evidence conviction. The sentences were ordered to run consecutively for a total prison sentence of 11 years. Brown filed a timely notice of appeal.

## II. Sufficiency and Manifest Weight of the Evidence

{¶ 30} Brown's first assignment of error states:

DEFENDANT'S CONVICTIONS ARE NOT SUPPORTED BY SUFFICIENT

EVIDENCE TO PROVE GUILT BEYOND A REASONABLE DOUBT AND ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶ 31}** Brown contends that the State did not present evidence sufficient to support the convictions for felonious assault and tampering with evidence. He further contends that neither conviction is supported by the weight of the evidence. Finally, he contends that the State failed to prove venue with regard to the felonious assault.

**{¶ 32}** We first address the issue of venue. Brown notes that the State's case hinged upon the claim that he hit Howard with his truck. He argues that the State failed to present evidence regarding the location of his truck at the time it hit Howard. In response, the State cites R.C. 2901.12(B), which provides that when an offense, or any element of that offense is committed in a motor vehicle that is "in transit, and it cannot reasonably be determined in which jurisdiction the offense was committed, the offender may be tried in any jurisdiction through which the [motor vehicle] passed." Brown contends the statute is inapplicable because "it cannot be disputed, that in order for this harm to occur, the motion of the subject motor vehicle must first come to a stop, the victim must then exit the vehicle; then the victim must be positioned in front of the motor vehicle; and after this break in travel, then at that time the vehicle must be driven in such a manner to knowingly strike the victim for purposes of causing serious physical harm. After this essentially stationary sequence of events, the subject vehicle theoretically must again be placed in a motionless position for purposes of restoring the victim to a passenger status in the vehicle." While convoluted, it appears that Brown's argument centers on his claim that he would have needed to stop his truck in order to hit Howard with the truck and that, therefore, his truck was not in transit at the time of the offense, making R.C. 2901.12(B)

inapplicable.

{¶ 33} "Venue is not a material element of any crime, but is a fact that must be proven beyond a reasonable doubt unless the defendant waives it." *State v. Singleton*, 10th Dist. Franklin No. 01AP-632, 2002 WL 264588, *3 (Feb. 26, 2002). Article I, Section 10 of the Ohio Constitution and R.C. 2901.12 require that "evidence of proper venue must be presented in order to sustain a conviction for an offense." *State v. Hampton*, 134 Ohio St.3d 447, 2012-Ohio-5688, 983 N.E.2d 324, ¶ 20. "It is not essential that the venue of the crime be proven in express terms, provided it be established by all the facts and circumstances in the case, beyond a reasonable doubt, that the crime was committed in the county and state as alleged in the indictment." *Id.*, ¶ 19, quoting *State v. Dickerson*, 77 Ohio St. 34, 82 N.E. 969 (1907), paragraph one of the syllabus. Circumstantial evidence may be used to establish venue. *State v. May*, 2015-Ohio-4275, 49 N.E.3d 736, ¶ 24 (8th Dist.).

{¶ 34} In this case, the bar, Howard's home and Brown's home are all located in Clark County. There is no evidence that the offense took place in any other county. Thus, a jury could reasonably infer that the offense took place in that county.[1]

{¶ 35} With regard to the provisions of R.C. 2901.12(B), we note that "transit" is not defined in the statutes regarding venue. However, it is commonly defined as "in course of passing from point to point," *Black's Law Dictionary* 778 (5th Ed. 1983), and as "conveyance of persons from one place to another." *Webster's Ninth New Collegiate Dictionary* 1253 (1988). From these definitions, one can conclude that a vehicle traveling

---

[1] We note that in his appellate brief, Brown claims that the State failed to prove "where in Clark County" the offense occurred.

from Point A to Point B is in transit. The fact that the vehicle might come to a stop at various points along that passage does not change the fact that it is in transit. For example, an individual driving while under the influence from Dayton to Cleveland is in transit. If the driver stops at a rest area along the way, the car is still in transit for purposes of the offense. Thus, the offense could be charged in any county along that passageway. Even if, as Brown theorizes above, he stopped his truck a few times while traveling home from the bar, his vehicle was still in transit. Therefore, his argument that the vehicle was not in transit lacks merit.

{¶ 36} We next turn to the claim that the evidence does not support the convictions. When a defendant challenges the sufficiency of the evidence, the defendant is arguing that the State presented inadequate evidence on an element of the offense to sustain the verdict as a matter of law. *State v. Hawn*, 138 Ohio App.3d 449, 471, 741 N.E.2d 594 (2d Dist. 2000). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 37} Our analysis is different when reviewing a manifest-weight argument. When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in

the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v.* Martin, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983). A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983).

{¶ 38} Brown was convicted of felonious assault in violation of R.C. 2903.11(A)(1). That statute provides, in pertinent part that "[n]o person shall knowingly * * * [c]ause serious physical harm to another * * *." "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B).

{¶ 39} Brown does not dispute that Howard suffered serious physical harm. Although he does dispute that the State proved he caused the harm, there is sufficient evidence to support a finding beyond a reasonable doubt that Howard caused the injuries when he hit Brown with his truck. The truck showed damage on the morning the police observed it outside Howard's apartment. It had not been damaged as of 6:00 p.m. the previous evening. Howard's blood was found on the truck as well as inside the truck and the truck bed. Thus, the remaining question is whether, as Brown claims, the State failed to prove that he acted knowingly.

{¶ 40} "Commonly, there is no direct evidence of a defendant's state of mind so the state must rely on circumstantial evidence to satisfy this element of its case. A defendant's state of mind may be inferred from the totality of the surrounding

circumstances." *State v. Rodano*, 8th Dist. Cuyahoga No. 104176, 2017-Ohio-1034, ¶ 43, quoting *In re Horton*, 4th Dist. Adams No. 04CA794, 2005-Ohio-3502, ¶ 23. Circumstantial evidence and direct evidence inherently possess the same probative value. *State v. Franklin*, 62 Ohio St.3d 118, 124, 580 N.E.2d 1 (1991). Thus, "a conviction can be sustained based on circumstantial evidence alone." *Id.*, citing *State v. Nicely*, 39 Ohio St.3d 147, 154–55, 529 N.E.2d 1236 (1988).

**{¶ 41}** There is evidence in the record upon which a jury could rely in concluding that Brown was possessive of Howard. Brown informed the police that Howard was his soul mate and the love of his life. In his handwritten note to her, Brown professed his love. Brown followed Howard home from work every day in order to keep other men from bothering her. There is also evidence that he frequently stopped by her place of work. He would go to her apartment to do chores in order to demonstrate that he was a good man who treated her well. When the 911 operator told Brown not to touch Howard, he responded by yelling "she's mine."

**{¶ 42}** Further, there is evidence that he was upset by Howard's interactions with the man at the bar. The surveillance videotapes show Brown engaging in a heated discussion with the man from the bar. It also shows him pushing Howard away from the man and attempting to get her away from the man. A reasonable juror could find that this evidence, when combined with the evidence of possessiveness, is indicative of motive to harm Howard.

**{¶ 43}** It is further noted that the rope found in the truck was looped and blood was found on the loop. A reasonable juror could compare the pictures of the rope and the pictures of the ligature marks on Howard's wrists and conclude that Brown bound her

wrists at some point in the course of the night. Such conduct is strong evidence that Brown knowingly caused Howard's injuries.

{¶ 44} The jury was also presented with evidence upon which it could rely in finding Brown's testimony lacked credibility, and that he obsfucated in order to avoid blame for the offense. When first confronted by the police about the damage to his truck, Brown blamed it on an accident near his father's home. However, he refused to show the police where the accident occurred. At trial, he changed the story and stated that he must have "superimposed" a prior wreck upon the damage to his truck because he was so surprised to hear that his truck was damaged. There is also evidence that Brown called 911 at 9:05 a.m., and informed the operator that he had found Howard fifteen to twenty minutes prior to calling. When the paramedics arrived eight minutes after Brown made the 911 call, he told them that he had found Howard an hour before they arrived. At the scene, Brown told one investigator that he had followed Howard home when she got off from work, and that he left and went home after watching her get into her apartment. However, he told another investigator that he had actually entered her apartment to show her the chores he had performed, and that he left after approximately 25 minutes. He denied seeing Howard until the next morning, but investigation revealed the two were together at the bar that night. Brown also made statements about Howard's ex-husband and one of her co-workers that could be seen as attempting to cast suspicion on others. At trial, Brown testified that he had been drinking since noon the day they were at the bar, and that he could not remember anything after following her home. He also testified that he was in a panic when he found Howard. However, Sneed testified that Howard was not emotional. Indeed, a review of the 911 tape demonstrates that Brown's voice is very

calm, and that he describes Howard's injuries in a very matter-of-fact tone. The only time he evinces any emotion on the tape is when he yelled "she's mine," and one other brief moment when he tells her to keep breathing.

{¶ 45} An attempt to cover up a crime can be construed as consciousness of guilt. *State v. Biros*, 78 Ohio St.3d 426, 488, 678 N.E.2d 891 (1997), and there is considerable evidence in the record from which the jury could have concluded that Brown engaged in an attempted cover up. For instance, the jury could have concluded that Brown took action in an attempt to convince the police that Howard had been beaten and molested in her apartment. This conduct includes Brown's statement that on July 30 he escorted Howard to her apartment at approximately 6:00 p.m., and that he did not see Howard again until he returned to her apartment the next morning and found her severely injured body. Further, the jury could have concluded that Brown, in furtherance of the cover up, placed the holes into the living room walls in an attempt to suggest a struggle in the apartment. Such conduct, if the jury concluded that it was taken as part of a cover up attempt, is strong evidence that Brown knowingly caused Howard's injuries.

{¶ 46} We conclude, based upon all the evidence presented, that there was sufficient evidence upon which a jury could rely to find that Brown harmed Howard, and that he did so knowingly. And we cannot say that the jury's verdict finding Brown guilty of the offense of felonious assault is against the manifest weight of the evidence.

{¶ 47} Brown was also convicted of tampering with evidence in violation of R.C. 2921.12(A)(1). That statute provides, in pertinent part, that "[n]o person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]lter, destroy, conceal, or remove any record, document, or thing,

with purpose to impair its value or availability as evidence in such proceeding or investigation."

{¶ 48} At trial, the State argued that Brown attempted to stage the apartment so that it looked as if Howard had been harmed in the apartment. Two holes were found in the walls of Howard's apartment. Pictures show that the holes are the approximate size of a hammerhead. A hammer was found in Brown's truck. A piece of the kitchen faucet was broken off.

{¶ 49} Further, Brown admitted that he did not call 911 immediately upon finding Howard. Instead, he placed her in the shower, cleaned her, and attempted to dress her. He also told the 911 operator that he had touched many things in the apartment. As noted by Sneed, Howard was grievously injured. Yet Brown moved her, and then placed her back on the floor of her bedroom rather than on her bed. When he called 911, Brown stated that Howard had been beaten and molested. His conversation with the 911 operator demonstrated that he was aware that a crime had been committed before he bathed Howard. Thus, we conclude that there was evidence sufficient to find Brown guilty of tampering with evidence, and we cannot conclude that the jury's verdict is against the manifest weight of the evidence. The first assignment of error is overruled.

### III. Failure to Preserve Evidence

{¶ 50} Brown asserts the following as his second assignment of error:

THE DEFENDANT WAS UNFAIRLY PREJUDICED BY THE STATE'S LACK OF INVESTIGATION AND FAILURE TO PRESERVE MATERIALLY EXCULPATORY EVIDENCE, RESULTING IN AN UNCONSTITUTIONAL

DIMINUTION OF HIS COMPULSORY PROCESS AND RIGHT OF CONFRONTATION GUARANTEES.

**{¶ 51}** Brown contends that he was prejudiced because the State did not investigate and preserve additional portions of the videotapes from the Ole Brick Tavern. He claims that additional footage "may have displayed a continuation of a complete lack of hostility which would have resulted in a complete negation of the state subscribed central motive." In essence, Brown contends that the surveillance videotapes from the bar may have contained exculpatory evidence indicating that he was not angered by Howard's behavior with the man at the bar, and thus, would have discredited the State's claim that he was motivated by that anger to harm Howard.

**{¶ 52}** There is no evidence, nor does Brown claim, that the State destroyed any exculpatory evidence. The issue Brown raises is whether the State had a duty to review and copy the entirety of the surveillance tapes. The evidence shows that the bar had cameras that were motion-activated. The bar owner indicated that some of the cameras were in areas throughout the building where there would not be much motion, and thus, those tapes were not as likely to be activated nor show as much activity. The bar owner further testified that she and Jordan looked at all the camera tapes during the relevant time frame. Jordan's testimony indicates that the bar staff aided him in determining the time frame the couple was at the bar, and that he copied only that time frame showing them by the bar counter. Jordan further testified that he did not see Brown and Howard on the other tapes.

**{¶ 53}** The state must disclose material evidence favorable to the defendant regarding either guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10

L.Ed.2d 215 (1963). Further, the state must preserve materially exculpatory evidence. *State v. Bolden*, 2d Dist. Montgomery No. 19943, 2004-Ohio-2315. The state, however, has no duty to look for and gather exculpatory evidence. *State v. Farris*, 2d Dist. Clark No. 2003 CA 77, 2004-Ohio-5980, ¶ 20. "Rather, when the state has failed to gather exculpatory evidence or to fully investigate the allegations, the defendant may either investigate the charge and collect the evidence himself, if such evidence is available, or he may point out the deficiencies in the state's investigation at trial." *Id.* Moreover, it is wholly speculative to assume that the part of the tapes not copied by the police showed any potentially exculpatory evidence. As noted by Jordan, the tapes do appear to exhibit some heated exchange between the two men. However, Jordan also testified that the two men ended up hugging each other several times. In fact, the last shot of the two men together shows them hugging and shaking hands. Even if there was additional footage of Brown and the unknown man hugging or shaking hands, we cannot say that there exists a reasonable probability that the trial's result would have been different had the evidence been gathered and disclosed.

{¶ 54} We conclude that Brown has failed to demonstrate that the police failed to properly investigate and preserve the contents of the videotapes. We further conclude that his claim that the videotapes may have contained exculpatory evidence is wholly speculative. Accordingly, the second assignment of error is overruled.

### IV. Prosecutorial Misconduct

{¶ 55} Brown's third assignment of error states as follows:

THE STATE OF OHIO'S CONDUCT DURING TRIAL, CONSTITUTED

PROSECUTORIAL MISCONDUCT, WHICH DEPRIVED DEFENDANT OF

A FAIR TRIAL AND DUE PROCESS.

**{¶ 56}** Brown contends that improper conduct by the prosecutor during trial requires a reversal of his convictions.

**{¶ 57}** The test for prosecutorial misconduct is whether the conduct is improper and, if so, whether it prejudicially affected substantial rights of the accused. *State v. Jones*, 90 Ohio St.3d 403, 420, 739 N.E.2d 300 (2000). The key to the analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

**{¶ 58}** Although not clear, it appears that Brown accuses the prosecutor of failing to timely reveal the existence of a potentially exculpatory witness. The record demonstrates that during the afternoon of the second day of trial, an investigator for the prosecutor informed the prosecutor that he had located and identified an individual seen in the surveillance videotape from the Ole Brick Tavern. The prosecutor instructed the investigator to attempt to contact the individual in order to get a statement. Later that afternoon, the investigator informed the prosecutor that the individual "stated that he had heard through some other party that perhaps Ms. Howard had fallen off a picnic table at the bar." Tr. p. 368. At the close of trial that day, the prosecutor notified the trial court and defense counsel of the situation. The trial court informed defense counsel that it would grant a continuance of the trial if counsel determined it necessary. The next morning, the matter was discussed before the jury was brought into the courtroom. At that time defense counsel indicated that he investigated the witness and that he did not believe that the witness would be helpful to the defense case. Defense counsel also

noted that he had discussed the information with Brown, and stated that Brown agreed with his decision not to call the witness. Defense counsel then elected to proceed with trial.

{¶ 59} We cannot conclude, from this record, that the prosecutor acted improperly. There is no showing that the prosecutor had the information prior to the second day of trial. Further, the record indicates that the prosecutor gave the information to the defense as soon as practicable after its discovery. Given that counsel was afforded a chance to pursue the information, was offered a continuance of the trial, and ultimately indicated that the information was not beneficial to the defense, we find no prejudice. Thus, we find this claim lacks merit.

{¶ 60} We next turn to Brown's claim that the prosecutor acted improperly by arguing that Brown was the only one present when Howard was injured. Brown argues that this directly conflicts with the disclosure during trial that the newly discovered witness indicated that Howard was injured when she fell off a picnic table at the bar. He argues that this information shows that others were present when Howard was injured.

{¶ 61} As noted, the witness at issue stated that someone else had informed him that Howard might have fallen off a picnic table. The witness's information depended upon hearsay evidence that was premised upon a mere possibility. Defense counsel investigated the matter and determined that it did not aid Brown's defense. Further, Jordan reviewed the surveillance videotapes and did not see Howard near the picnic tables. Thus, it appears that the evidence, which was speculative at best, was not borne out by investigation. Therefore, we cannot say that the prosecutor acted improperly by arguing the State's theory of the case that Brown was the only person with Howard when

he hit her with his truck.

{¶ 62} Brown next argues that the prosecutor misled the jury by indicating that Howard's injuries were caused by a single blow from Brown's truck. A review of the record shows that during closing argument, the prosecutor stated, "[Pollack] testified that it's unlikely that one blow caused all of those injuries like slipping and falling. But what about one blow by a vehicle?" Brown contends that this was misleading because Pollack's testimony conclusively established that Howard's injuries were caused by repetitive impact to her head, and not by a single blow from a truck.

{¶ 63} A review of the record shows that Howard and Pollack were the first witnesses called by the State following the discussion of the discovery of the potential newly discovered witness and the statement that Howard may have fallen from a picnic table. The transcript shows that almost all of the State's questioning of Pollack centered on Howard's treatment and the severity of her injuries. However, at the very end of the State's questions, the prosecutor, asked whether Howard's injuries occurred all at the same time. At that point, Pollack indicated that it was "less likely." Tr. p. 390. Then the prosecutor asked whether the injuries could have been sustained by a slip and fall, to which Pollack responded that it was "less likely." *Id.* On cross-examination, defense counsel asked if it was possible to sustain such injuries from a slip and fall. Pollack responded that, in her practice, she had not observed such injuries resulting from a slip and fall. Defense counsel then asked if she was opining that it was unlikely that a slip and fall accident was the cause of the injuries. Pollack responded, "[i]t would require repetitive head injury, repetitive impact, force impact to the head." *Id.*

{¶ 64} The medical records admitted at trial indicate that Howard had been

assaulted (a theory suggested by Brown when he talked to the 911 operator and first responders). There is nothing in the medical records regarding the mechanism of the assault. Further, there is nothing in this record to suggest that Pollack was aware of the evidence suggesting that Howard had been struck by a truck. The only alternative mechanism suggested by the State was a slip and fall. Pollack found that scenario unlikely. At no point did Pollack opine that Howard's injuries could not have been caused by one blow from a pickup truck. Thus, we cannot say that the prosecutor improperly misled the jury by indicating that Howard's injuries were caused by being hit by Brown's truck.

{¶ 65} Brown next contends that the prosecutor asked improper questions of Jordan regarding the surveillance tapes. Specifically, he argues that the State impermissibly led Jordan to opine that Brown appeared hostile in the tapes.

{¶ 66} A review of the transcript shows that while the videotape was being played for the jury, the prosecutor asked Jordan to describe what he was seeing. At one point, Jordan indicated that it appeared Brown was not "very pleased with this guy [indicating the man seated at the bar when Howard was dancing on the bar]." Later, Jordan indicated that it appeared Brown and the unknown man were attempting to "make up for a disagreement."

{¶ 67} At no point did the prosecutor ask a leading question of Jordan. The prosecutor did not ask him to speculate as to what was being said by the people on the tape. Further, when defense counsel objected to any speculative statements by Jordan, the trial court sustained and instructed the jury to disregard any such remarks. Thus, we conclude that the record does not support this claim of prosecutorial misconduct.

{¶ 68} Brown next contends that the prosecutor misstated the standard for reasonable doubt as being in the range of 49% to 51%. The portion of the prosecutor's closing argument to which Brown cites is as follows:

I told you at the beginning of this case that all things have some doubt. You will have some doubt in your mind, but the standard here is beyond a reasonable doubt.

Now, I like to think of that this way, and I'll give you an example. The Judge will tell you you must be firmly convinced of the truth of the matter. Firmly convinced of the truth of the matter. It's 51-49, okay. 51 to 49 I think he did it. 100 percent, I'm certain he did it. Firmly convinced, I know he did it. If you go back there, ladies and gentlemen, and you begin your deliberation and you talk amongst yourselves and you can say in your mind, "I know he did it, I know he caused her injuries," he is guilty. If you can say to yourself: I know that he tried to destroy evidence that we were gonna use to prosecute him, then you have to find him guilty. That's the standard. We've proven the case beyond a reasonable doubt.

Tr. p. 456-457.

{¶ 69} It appears that the prosecutor was attempting to illustrate the concept that a reasonable doubt falls somewhere between a preponderance of the evidence and an absolute certainty. The prosecutor's statement was not an accurate explanation of proof beyond a reasonable doubt. However, we cannot conclude that this misstatement prejudiced Brown. Further, the trial court correctly instructed the jury on the meaning of reasonable doubt. Thus, any possible confusion raised by the prosecutor was corrected.

{¶ 70} Finally, Brown appears to raise a claim that the prosecutor made numerous inflammatory statements during closing argument. However, other than the claims cited above, he makes no reference to the record in support of this claim. Thus, to the extent that Brown invites us to review the record for evidence of other claimed errors without a citation to the record as required by App.R. 16(A), we decline. It is not our duty to search the record for evidence supporting an appellant's argument. *State v. Montgomery*, 2d Dist. Montgomery No. 25277, 2013-Ohio-4509, ¶ 4. *See also* App.R. 12(A)(2).

{¶ 71} The third assignment of error is overruled.

## V. Maximum, Consecutive Sentence

{¶ 72} For his fourth assignment of error, Brown asserts the following:

THE TRIAL COURT ERRED IN ITS SENTENCING OF DEFENDANT AND

THE TRIAL COURT ERRED IN IMPOSING MAXIMUM, CONSECUTIVE

SENTENCES ON DEFENDANT, AS THEY WERE NOT SUPPORTED BY

THE RECORD AND THE COURT DID NOT MAKE THE NECESSARY

FINDINGS.

{¶ 73} Brown contends the trial court erred in imposing maximum, consecutive sentences.

{¶ 74} In reviewing a felony sentence, we must apply the standard of review set forth in R.C. 2953.08(G)(2), rather than an abuse of discretion standard. *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 9-10. Under that statute, an appellate court may increase, reduce, or modify a sentence, or it may vacate the sentence and remand for resentencing, only if it clearly and convincingly finds either

that (1) the record does not support the sentencing court's findings under certain enumerated statutory sections (including R.C. 2929.14(C)(4) regarding consecutive sentences), or (2) the sentence is otherwise contrary to law. *Id.* "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Id.* at ¶ 22, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. A sentence is contrary to law when it does not fall within the statutory range for the offense or if the trial court fails to consider the purposes and principles of felony sentencing set forth in R.C. 2929.11 and the sentencing factors set forth in R.C. 2929.12. *State v. Pawlak*, 8th Dist. Cuyahoga No. 103444, 2016–Ohio–5926, ¶ 58.

**{¶ 75}** A trial court is not required to make any particular findings to justify maximum prison sentences. *State v. Whitt*, 2d Dist. Clark No. 2014–CA–125, 2016–Ohio–843, ¶ 8. In *Marcum*, the Ohio Supreme Court noted:

[S]ome sentences do not require the findings that R.C. 2953.08(G) specifically addresses. Nevertheless, it is fully consistent for appellate courts to review those sentences that are imposed solely after consideration of the factors in R.C. 2929.11 and 2929.12 under a standard that is equally deferential to the sentencing court. That is, an appellate court may vacate or modify any sentence that is not clearly and convincingly contrary to law only if the appellate court finds by clear and convincing evidence that the record does not support the sentence.

*Marcum* at ¶ 23.

{¶ 76} R.C. 2929.11 provides that "[t]he overriding purposes of felony sentencing are to protect the public from future crime by the offender and others and to punish the offender using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources."

{¶ 77} R.C. 2929.12(B) sets forth nine factors to consider when determining whether an offender's conduct is more serious, while section (C) sets forth four factors to consider in determining whether the conduct is less serious. R.C. 2929.12(D) and (E) both list five factors to consider in making a determination that an offender is more, or less, likely to reoffend.

{¶ 78} In reviewing the seriousness factors of R.C. 2929.12(B) and (C), the trial court found that the offenses were more serious because Brown had caused serious, permanent harm to Howard. The trial court further found that Howard's relationship with Brown facilitated the offenses. The court stated that it found no factors indicating that the offenses were less serious.

{¶ 79} With regard to the likelihood of committing future crimes, the record reflects that the trial court found the existence of several factors making recidivism more likely. The Presentence Investigation Report (PSI) indicates that Brown's adult criminal record includes convictions for disorderly conduct in 1993; cruelty to animals in 1995; criminal trespass in 1996; aggravated assault in 1999; firearms in a motor vehicle in 2000; bribery and possession of drugs in 2001; driving under a suspended license and operating a vehicle while intoxicated in 2007; shooting wild animals along a roadway, hunting deer

with the aid of a motor conveyance and having weapons under disability in 2010; and operating a vehicle while intoxicated in 2012. The PSI further shows that Brown violated a condition of judicial release related to the 2010 convictions, and that he was on electronic monitoring from January 2015 until July 24, 2015, one week prior to the instant offense. The trial court also found that Brown has not responded favorably to sanctions given that he drove under a suspended license and had violated the terms of his judicial release.

{¶ 80} The trial court found that Brown denied committing the offenses, and that he showed no remorse. Finally, the trial court found no relevant factors to indicate that Brown is not likely to commit future crimes.

{¶ 81} As previously noted, Brown was convicted of felonious assault, a second degree felony. The range of sentences for a second degree felony is two to eight years. R.C. 2929.14(A)(2). The sentence range for Brown's conviction for tampering with evidence, a third degree felony, is nine to thirty-six months. R.C. 2929.14(A)(3)(b). Thus, the sentences meted out by the trial court are within the statutory range. Further, the record shows that the trial court properly reviewed the PSI, Brown's statement at sentencing, and the statements of counsel. The record also shows that the trial court considered the principles and purposes of sentencing under R.C. 2929.11, and that it balanced the seriousness and recidivism factors set forth in R.C. 2929.12. Based upon our review of the record, we conclude that the trial court's decision to impose maximum sentences is not contrary to law and is supported by the facts in the record. Therefore, we conclude that the trial court did not err by imposing maximum sentences.

{¶ 82} "After determining the sentence for a particular crime, a sentencing judge

has discretion to order an offender to serve individual counts of a sentence consecutively." *State v. McGlothan*, 2d Dist. Clark Nos. 2014–CA–120, 2014–CA–121, 2014–CA–122, 2015-Ohio-2713, ¶ 8. R.C. 2929.14(C)(4) permits the imposition of consecutive prison terms if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

**{¶ 83}** The trial court stated that consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. The court further found that the harm caused to Howard

was so great that a single prison term did not adequately reflect the seriousness of Brown's conduct. The trial court also found that Brown's criminal record demonstrated the need for consecutive sentences. As noted above, the trial court also properly considered the factors set forth in R.C. 2929.12 and the principles set forth in R.C. 2929.11. Thus, we conclude that the trial court did not err in imposing consecutive sentences.

{¶ 84} We conclude that the trial court did not err in sentencing. Accordingly, the fourth assignment of error is overruled.


## VI. Ineffective Assistance of Counsel

{¶ 85} Brown's fifth assignment of error provides as follows:

THE DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL.

{¶ 86} Brown contends that trial counsel's conduct constituted ineffective assistance of counsel requiring a reversal of his convictions.

{¶ 87} We evaluate ineffective assistance of counsel arguments in light of the two prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989). To prevail on his claims of ineffective assistance of counsel, Brown must show that counsel's representation fell below an objective standard of reasonableness, and that he was prejudiced by counsel's deficient performance. *Id.*

{¶ 88} To establish the first prong of ineffective assistance, there must be a substantial violation of any of counsel's essential duties to his client. *State v. Smith*, 72

Ohio App.3d 342, 344, 594 N.E.2d 688 (2d Dist. 1991). Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland* at 689. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. *Id.*

{¶ 89} To establish the second prong, prejudice, Brown must show that there "exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Strickland* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

{¶ 90} Brown first contends that trial counsel failed to properly investigate the case and failed to prepare for trial. Obviously, we cannot tell from this record whether defense counsel failed to investigate or prepare for the case. But we find nothing in the record to support the claim that counsel was unprepared. Instead, we conclude that this claim is belied, to an extent, by the fact that the record shows counsel's trial strategy focused upon the fact that the State's evidence covered only the period of time prior to, and after, the injuries occurred, as well as the fact that the State did not produce any witness who actually saw how Howard got hurt. Thus, we cannot find that counsel was ineffective with regard to this claim.

{¶ 91} Next, although not entirely clear, it appears that Brown next faults counsel for failing to file a motion to suppress. Brown does not specify what he thinks should have been suppressed. The only portion of Brown's interaction with the authorities that we find could have any bearing on this claim is his encounter with the police at Howard's

apartment.

{¶ 92} In determining whether a particular encounter implicates the Fourth Amendment, the issue is whether, in view of all the circumstances surrounding the encounter, a reasonable person would believe he was not free to leave, or to decline the officer's request, or to terminate the encounter. *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *Florida v. Bostick*, 501 U.S. 429, 439, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). Fourth Amendment guarantees are not implicated in a consensual encounter unless the officer has restrained a person by a show of force or authority so that a reasonable person would not feel free to decline the officer's requests or otherwise terminate the encounter. *Mendenhall* at 554, 100 S.Ct. 1870.

{¶ 93} A consensual encounter occurs when the police approach a person in a public place, the police engage the person in conversation, and the person remains free not to answer or to walk away. *Mendenhall* at 553–54, 100 S.Ct. 1870. So long as the police do not indicate that compliance is necessary, an encounter remains consensual even if the police ask questions, ask for identification, or ask to search the person's belongings. *Florida v. Rodriguez*, 469 U.S. 1, 4–6, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984).

{¶ 94} While the apartment was not a public place, there is nothing to suggest that Brown was coerced into speaking to the police or that he was not free to leave. Indeed, the record indicates that when the police requested to see where Brown wrecked his truck, Brown declined and then declined to answer any further questions. Further, there is nothing in the record to suggest that when Brown made the statements at issue he was in police custody so that *Miranda* warnings were required.

{¶ 95} On this record, it is not unreasonable to conclude that counsel did not deem a motion to suppress necessary. Further, our review of the record does not support a finding that counsel was ineffective in this regard.

{¶ 96} The fifth assignment of error is overruled.

## VII. Cumulative Error

{¶ 97} Brown's sixth assignment of error states:

OTHER ERRORS WERE COMMITTED AT TRIAL NOT RAISED HEREIN BUT APPARENT ON THE RECORD AND THE CUMULATIVE EFFECT OF ALL THE ERRORS OCCURRING AT TRIAL DEPRIVED THE DEFENDANT OF A FAIR TRIAL AND DUE PROCESS.

{¶ 98} By this assignment of error, Brown appears to claim that there are errors in the record which he has not addressed, but which are "apparent." He further seems to argue that when those apparent errors are combined with the errors argued in the preceding assignments of error, their cumulative effect is so prejudicial as to warrant reversal of his convictions.

{¶ 99} Under the doctrine of cumulative error, "[s]eparately harmless errors may violate a defendant's right to a fair trial when the errors are considered together. * * * In order to find cumulative error, we first must find that multiple errors were committed at trial." *State v. Harris*, 2d Dist. Montgomery No. 19796, 2004-Ohio-3570, ¶ 40. "A conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Powell*, 132 Ohio St.3d 233,

2012-Ohio-2577, 971 N.E.2d 865, ¶ 223, citing *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus.

{¶ 100} Again, this court will not comb the record for any uncited error. We have addressed the arguments raised by Brown in the assignments of error set forth above, and have found no error, let alone prejudicial error. Thus, there can be no cumulative error.

{¶ 101} The sixth assignment of error is overruled.


## VIII. Conclusion

{¶ 102} All of Brown's assignments of error being overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

HALL, P.J., concurs.

FROELICH, J., concurring in judgment only.




Copies mailed to:

Elizabeth L. McCormick
Carlo C. McGinnis
Hon. Richard J. O'Neill