[Cite as *State v. Segovia*, 2024-Ohio-1392.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2023-CA-35 |
| | : | |
| v. | : | Trial Court Case No. 23-CR-0247 |
| | : | |
| NEIL SEGOVIA | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on April 12, 2024

. . . . . . . . . . .

JOHNNA M. SHIA, Attorney for Appellant

ROBERT C. LOGSDON, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} Neil Segovia appeals from his conviction for felonious assault. He raises arguments related to the admissibility of evidence, the weight and sufficiency of the evidence, and his sentence. Because we find his arguments to be without merit, the judgment of the trial court is affirmed.

**Procedural History**

{¶ 2} Segovia was indicted on April 24, 2023, on two counts of felonious assault. Before trial, the State filed a notice indicating that it intended to introduce evidence of other crimes, wrongs, or acts by Segovia pursuant to Evid.R. 404(B); specifically, the State intended to offer testimony by the victim, Jerome Gleaves, that Segovia's motive for the assaults was an unpaid drug debt owed by Gleaves to Segovia. The same day, Segovia filed a response asserting that the proposed evidence "would not tend to show opportunity, plan or identity" and that its probative value was outweighed by unfair prejudice. Segovia was tried in July 2023, and the jury found him guilty on both counts; the trial court merged the two offenses at sentencing. The court imposed an indefinite sentence of 8 to 12 years in prison.

**The Evidence**

{¶ 3} Multiple witnesses testified at trial. The evidence presented was as follows.

*Jerome Gleaves*

{¶ 4} Gleaves testified that, on March 28, 2023, he resided at an apartment on West College Avenue in Springfield. On that date, Segovia visited Gleaves unexpectedly, demanding money. Gleaves had met Segovia a couple of years earlier, had recently become reacquainted with him, and had purchased cocaine from him. According to Gleaves, he sometimes saw Segovia every other day, and sometimes only once in three weeks. Gleaves testified that seven or eight days prior to March 28, he had been "jumped" in his apartment by two people who lived "downstairs"; his assailants "sucker punched" him with "a pair of brass knuckles" in the face, "crush[ing]" his face. Gleaves's dentures were broken in half, his jaw was broken in two places, and his nose

was broken in three places; he had been in the hospital for seven days and had been discharged only two days before his encounter with Sevogia on March 28, 2023. Gleaves testified that the surgeon told him that the damage to his face was so severe that, if he got hit one time in the face, it was "going to kill [him]."

{¶ 5} According to Gleaves, he had been giving Segovia money "like once every month for like three months ahead of time," and Segovia took "just about [his] whole check." Gleaves then gave Segovia his Direct Express card, and Segovia would take that to the bank and "take all the money out." On March 28, 2023, Gleaves did not believe that he owed Segovia any money, but Segovia said that Gleaves "owed him" (Sevogia) because something was missing from belongings Segovia had left at Gleaves's house. According to Gleaves, Segovia believed that Gleaves had been paid that day, but Gleaves had not. Segovia started "pacing back and forth" and said "this ain't going to work. I'm going to kill you." Segovia then "started wailing" on Gleaves; Gleaves, on the floor, tried to protect his face while Segovia repeatedly punched and kicked him in the back and beat him in the back with a wooden mop handle he found in the apartment. Segovia repeatedly said, "let me see that face." Gleaves testified that he had been "scared to death." To "[b]uy time," he told Segovia that his Direct Express card was at the home of Rose Mills, with whom he had a child, although the card was actually in Gleaves's pocket.

{¶ 6} Segovia demanded that Gleaves accompany him to Mills's home in Springfield, a short drive away, to retrieve the Direct Express card. Gleaves told Segovia that he was in pain and thought Segovia had broken his ribs, and Segovia told him to

"shut up." Gleaves knew that there was no money on the card. He had not paid rent for three months because Segovia "got [his] money for three months prior," and Gleaves "didn't want to die."

{¶ 7} When they arrived at Mills's address, Gleaves went to speak with her on her porch while Segovia watched. Gleaves acted like Mills handed something to him and got back into the car with Segovia, who asked to "hear the balance" on the card. Gleaves pretended to call about the balance but then quickly hung up, because he believed that if Segovia heard the money was already gone, he would probably kill him.

{¶ 8} Law enforcement officers were subsequently dispatched to Gleaves's home on March 28, 2023. They took pictures of his injuries from the previous assault and of the injuries inflicted by Segovia, which were later shown to the jury. Gleaves had been apprehensive about telling the responding officers that he was a drug user and that the incident with Segovia had been related to a drug debt, because he was fearful and did not want to go to jail. When he was taken to the hospital, Gleaves was diagnosed with a ruptured spleen and four broken ribs from the encounter with Segovia on March 28, 2023. According to Gleaves, he had trouble breathing and "felt like something was stabbing" his lung. He had surgery to stop the bleeding in his spleen. Gleaves was subsequently shown a photo lineup at the hospital by detectives, and he identified Segovia in "[a]bout 3 seconds."

*Rose Mills*

{¶ 9} Rose Mills testified that on March 28, 2023, she lived on Larch Street in Springfield. On that date she received a call from Gleaves, who was yelling into the

phone that he needed the beating to stop and was coming to get his bank card, which Mills did not have. Mills understood that Gleaves was in some sort of trouble and told him not to bring anyone dangerous to the home where she and their child lived. Gleaves kept yelling that he was on his way, and Mills met him at the front door. According to Mills, when Gleaves arrived, he was holding his side, moaning, and shaking, and he seemed very nervous. Gleaves left after a short time.

{¶ 10} Within the hour, Mills received another call from Gleaves saying that his side still hurt, and she advised him to go to the hospital. Mills usually saw Gleaves every other weekend and knew that he had a drug problem. Three days before Gleaves came to her home with Segovia, Mills had taken him to the hospital for treatment of his facial injuries. At that time, Gleaves's eye and jaw had been swollen and bruised, and he had not been complaining of any rib pain.

*Officer Zachary Chenoweth*

{¶ 11} Officer Zachary Chenoweth was a training officer with the Springfield Police Department on March 28, 2023, and he was dispatched to Gleaves's address on West College Avenue after 4:00 p.m. on a report of a possible assault. Chenoweth testified that Gleaves "had obviously been assaulted" and had several bruises and abrasions. Gleaves advised Chenoweth that some of his injuries were from a previous assault and that he also had new injuries from an assault that had just occurred. According to Chenoweth, Gleaves's new injuries were red, and he had bruising on his face that appeared to have been previously inflicted. Chenoweth identified the photos he took of Gleaves's injuries. In his training and experience, Chenoweth testified that the new

injuries on Gleaves's back and shoulder area appeared consistent with blunt force trauma. Gleaves told Chenoweth that he only knew his most recent assailant as "Neil" and provided "a very vague description" of Segovia as a "shorter male, light-skinned dark male." Chenoweth called for a medic to take Gleaves to the hospital.

{¶ 12} On cross-examination, Chenoweth testified that Gleaves reported that he had borrowed $200 from "Neil" to move into his apartment, which he had already repaid, that he had given "Neil" his Direct Express card, and that "Neil" had then left. Gleaves further stated that he had been struck seven or eight times in the face by "Neil." Gleaves did not report to Chenoweth that he had gone to Larch Street after the assault and then returned home. Chenoweth testified that Gleaves did not appear to be under the influence of drugs or alcohol at the time.

*Detective Joshua Lish*

{¶ 13} Detective Joshua Lish testified that, on March 29, 2023, the detective assigned to Segovia's case had asked him to administer a photo lineup to Gleaves. Lish knew nothing about the case or any of the suspects involved. Lish identified the photo array he administered, which was signed by Gleaves and had Segovia's photo circled. Lish testified that Gleaves selected Segovia "almost immediately," and Lish wrote on the key page to the lineup that Gleaves indicated that he was "100,000 percent sure" of Segovia's identity as his assailant.

*Detective Justin Massie*

{¶ 14} Detective Justin Massie testified that he worked in the Crimes Against Persons Unit of the Springfield Police Department, having been so employed for four and

a half years. During his career, Massie had investigated "hundreds if not thousands" of cases. In Massie's experience, delayed reporting of crimes and of details of crimes was common, especially if the victim had also been involved in criminal activity.

{¶ 15} Massie described the process he employed to generate a photo lineup to present to Gleaves. He had also obtained a release from Gleaves for his hospital records, which were admitted into evidence. According to Massie, Gleaves's injuries from March 28, 2023, were consistent with being hit with a blunt object. Gleaves advised Massie that he had reported the prior assault to Wittenberg University police, and Massie confirmed with that department that Gleaves had reported a separate assault prior to March 28, 2023.

{¶ 16} On cross-examination, Massie testified that Gleaves had not told him that Gleaves had had almost daily contact with Segovia for six months prior to the assault or that, prior to that contact, he had not seen Segovia in two years. Massie had been under the impression from Gleaves that Segovia appeared at Gleaves's door unexpectedly to collect on a two-year old debt. Gleaves told Massie that he had been assaulted a few days earlier, and the prior injuries to his face were visible. Gleaves described being punched in the face by Segovia but reported that "the actual injury and all the pain he was suffering to his face" had been caused by another person during an entirely separate incident.

{¶ 17} Gleaves told Massie that he had accompanied Segovia to Mills's house on Larch Street on March 28, and Massie was aware that Gleaves had not reported that fact to the first responders. Massie testified that the hospital records indicated that

Gleaves's account of the March 28 incident was that he had let an individual into his apartment whom he considered to be a friend, and that person had then struck him with a baseball bat; the hospital records also indicated that Gleaves had a history of chronic substance abuse and was on Suboxone. Notes by a social worker in Gleaves's records indicated that Gleaves reported that he felt safe to go home and safe in his family and intimate relationships, and that he had been attacked by people he thought were his friends because of "a girl." Gleaves was coherent when he spoke to Massie in the hospital.

{¶ 18} The defense did not call any witnesses at trial.

### Evid.R. 404(B)

{¶ 19} Segovia asserts three assignments of error. His first assignment of error is as follows:

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT PERMITTED THE JURY TO HEAR INADMISSIBLE EVID.R. 404(B) EVIDENCE.

{¶ 20} Segovia argues that Gleaves's testimony that Segovia was a drug dealer was not properly admitted pursuant to Evid.R. 404(B). He asserts that neither motive nor identity was a material element in dispute and that the probative value of any evidence that he was allegedly a drug dealer was outweighed by its prejudicial effect. According to Segovia, his identity was not in dispute because Gleaves testified that he knew Segovia, identified him to responding officers, and identified him in court. He argues that motive was unclear given the differing accounts of the incident Gleaves provided to law

enforcement and hospital personnel, which contradicted Gleaves's trial testimony regarding the alleged drug debt. Segovia asserts that the State improperly used other acts evidence to boost Gleaves's credibility and to make Segovia "look bad in front of the jury."

{¶ 21} The State responds that the purpose of the prior bad acts evidence was directly tied to motive and to Segovia's identity. According to the State, the purpose of the evidence was not to prove that Segovia acted in conformity with his character as a drug dealer, but to demonstrate why he assaulted Gleaves and why Gleaves was able to identify him in a photo lineup as his assailant. The State asserts that Segovia cannot argue that his identity was not in dispute and yet maintain his innocence. Finally, the State asserts that Segovia's motive and identity were "highly material to proving his guilt."

{¶ 22} " 'A hallmark of the American criminal justice system is the principle that proof that the accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose is to show the accused's propensity or inclination to commit crime.' " *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 20, quoting *State v. Curry*, 43 Ohio St.2d 66, 68, 330 N.E.2d 720 (1975). This principle "is premised on our understanding of human nature: the typical juror is prone to 'much more readily believe that a person is guilty of the crime charged if it is proved to his satisfaction that the defendant has committed a similar crime.' " *Id.,* quoting *State v. Hector*, 19 Ohio St.2d 167, 174-175, 249 N.E.2d 912 (1969).

{¶ 23} "The general principle that guides admission of evidence is that '[a]ll relevant evidence is admissible * * *.' " *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-

2407, 972 N.E.2d 528, ¶ 11, citing Evid.R. 402.   To be relevant, evidence must have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401.

{¶ 24} Evid.R. 404(B), however, provides exceptions to the general principle that all relevant evidence is admissible and states:

(B) Other Crimes, Wrongs or Acts.

(1) Prohibited Uses. Evidence of any other crime, wrong or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) Permitted Uses * * *.  This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. * * *

{¶ 25} To be admissible under Evid.R. 404(B)(2), the "key is that the evidence must prove something other than the defendant's disposition to commit certain acts." *Hartman,* 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651*,* at ¶ 22.   In other words, "while evidence showing the defendant's character or propensity to commit crimes or acts is forbidden, evidence of other acts is admissible when the evidence is probative of a separate, nonpropensity-based issue."   *Id.*

{¶ 26} "The Supreme Court of Ohio has put forth a three-step analysis for a trial court to use in determining the admissibility of other acts evidence."   *State v. Walter*, 2d Dist. Montgomery No. 29614, 2013-Ohio-2700, ¶ 62, citing *State v. Williams*, 134 Ohio

St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20. "The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *Williams* at ¶ 20, citing Evid.R. 401. The second step requires the trial court to "consider whether evidence of the crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid. R. 404(B)." *Id.* The third step requires the trial court "to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice.*" Id.,* citing Evid.R. 403. "The defendant's other act 'must have such a temporal, modal and situational relationship with the acts constituting the crime charged that evidence of the other acts discloses purposeful action in the commission of the offense in question.' " *Walter* at ¶ 63, quoting *State v. Snowden*, 49 Ohio App.2d 7, 10, 359 N.E.2d 87 (1st Dist.1976), citing *State v. Burson*, 38 Ohio St.2d 157, 159, 311 N.E.2d 526 (1974).

{¶ 27} "The admissibility of other-acts evidence pursuant to Evid.R. 404(B) is a question of law. The [trial] court is precluded from admitting improper character evidence under Evid.R. 404(B), but it has discretion to allow other-acts evidence that is admissible for a permissible purpose." (Citation omitted.) *State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, ¶ 72, citing *Hartman* at ¶ 22, citing *Williams* at ¶ 17.

{¶ 28} The trial court reasonably concluded that evidence of an unpaid drug debt owed by Gleaves to Segovia was relevant and admissible pursuant to Evid.R. 404(B). Gleaves characterized his relationship with Segovia as situational and one of drug user

(Gleaves) and drug dealer (Segovia), and the assaults disclosed purposeful action by Segovia to collect an unpaid debt. The offense was not remote in time to Gleaves's ongoing drug-related relationship with Segovia. Most significantly, the evidence was offered for the legitimate purpose of establishing Segovia's identity and his motive, namely that he came to Gleaves's apartment to collect on a past due drug debt. Gleaves's testimony regarding the drug debt was not offered to establish Segovia's propensity to commit crime as a drug dealer. Although this testimony was prejudicial to Segovia, it was not unduly so, and the trial court did not err in admitting it.

{¶ 29} Finally, we note that the court instructed the jury that, if it found the evidence of Segovia's alleged drug activity to be credible, it was only to consider that evidence "for the limited purpose of determining whether and to what extent it establishe[d] motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident with respect to the offenses charged in the indictment." We have noted that "[c]urative instructions are generally viewed as sufficient to remedy the risk of undue prejudice." *State v. Gray*, 2d Dist. Darke No. 2019-CA-7, 2020-Ohio-1402, ¶ 48, citing *Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, at ¶ 24; *State v. Wharton*, 4th Dist. Ross No. 09CA3132, 2010-Ohio-4775, ¶ 26-28. "Juries are presumed to follow instructions." *Gray* at ¶ 48, citing *State v. Jones*, 90 Ohio St.3d 403, 414, 739 N.E.2d 300 (2000).

{¶ 30} For the foregoing reasons, Segovia's first assignment of error is overruled.

### Sufficiency and Weight of the Evidence

{¶ 31} Gleaves's second assignment of error is as follows:

THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE TO SUSTAIN SEGOVIA'S CONVICTIONS.

{¶ 32} Segovia argues that the evidence showed that he "did not knowingly cause serious physical harm" or "use a stick to deliver deadly harm." According to Segovia, the evidence established that Segovia allegedly wanted Gleaves's debit card and that Gleaves was able to drive with Segovia to get it; he asserts that, if believed, this evidence showed that he was not trying to kill Gleaves but only injure him, such that the stick was "not a deadly weapon." Segovia notes that there were many discrepancies in Gleaves's versions of events and asserts that he was not credible. According to Segovia, Gleaves "had more of a motive" to lie to incriminate Segovia than Segovia had to hurt Gleaves.

{¶ 33} In response, the State argues that Gleaves's testimony established the prior relationship between Gleaves and Segovia, including that Gleaves knew who Segovia was but did not know his last name. This knowledge was corroborated by the speed and confidence with which Gleaves identified Segovia in the photo line-up. The State notes that the mop handle was found in Gleaves's apartment and asserts that there was enough evidence in the record to establish that Segovia had acted knowingly in causing serious physical harm. Finally, the State asserts that the mop handle was "capable of inflicting death" and was "used as a weapon."

{¶ 34} " ' * * * [A]lthough sufficiency and manifest weight are different legal concepts, * * * a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency.' (Citations omitted.)" *State v. Curtis*,

2020-Ohio-4152, 157 N.E.3d 879, ¶ 44 (2d Dist.), quoting *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11; *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15.

{¶ 35} "* * * [A] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12. " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). *See also Curtis* at ¶ 19.

{¶ 36} The credibility of the witnesses and the weight to be given to their testimony are primarily matters for the trier of fact to resolve. *State v. Griffith*, 2d Dist. Montgomery No. 26451, 2015-Ohio-4112, ¶ 28, citing *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the

peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). This court will not substitute its judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *State v. Bradley*, 2d Dist. Champaign No. 1997-CA-03, 1997 WL 691510, *4 (Oct. 24, 1997).

{¶ 37} R.C. 2903.11 proscribes felonious assault: "(A) No person shall knowingly do either of the following: (1) Cause serious physical harm to another * * *;   (2) Cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."   R.C. 2901.22(B) defines "knowingly" as follows:

> A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature.   A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

Serious physical harm is defined as: "Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement; [or] * * * Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain."   R.C. 2901.01(A)(5)(d-e).

**{¶ 38}** "The degree of harm that rises to the level of 'serious' physical harm is not an exact science, particularly when the definition includes such terms as 'substantial,' 'temporary,' 'acute,' and 'prolonged.' " *State v. Irwin*, 7th Dist. Mahoning No. 06MA20, 2007-Ohio-4996. "Under certain circumstances, a bruise can constitute serious physical harm because a bruise may satisfy the statutory requirement for temporary serious disfigurement." *State v. Bootes*, 2d Dist. Montgomery No. 23712, 2011-Ohio-874, ¶ 19, citing *State v. Worrell,* 10th Dist. Franklin No. 04-AP-410, 2005-Ohio-1521, ¶ 47-51, *reversed on other grounds by In re Criminal Sentencing Statutes Cases*, 109 Ohio St.3d 313, 2006-Ohio-2109, 847 N.E.2d 1174. The Eighth District found sufficient evidence of serious physical harm where the victim "suffered a black eye, bruising and swelling to the right side of her face, scratches on her neck, and bruising on her thighs and buttocks." *Bootes* at ¶ 19*,* citing *State v. Plemmons-Greene,* 8th Dist. Cuyahoga No. 92267, 2010-Ohio-655. " 'Where injuries to the victim are serious enough to cause him or her to seek medical treatment, the finder of fact may reasonably infer that the force exerted on the victim caused serious physical harm as defined in R.C. 2901.01(A)(5).' " *State v. Lee*, 8th Dist. Cuyahoga No. 82326, 2003-Ohio-5640, ¶ 24, quoting *State v. Wilson*, 8th Dist. Cuyahoga No. 77115, 2000 WL 1369868, *5 (Sept. 21, 2000). "Where the assault causes a bone fracture, the element of serious physical harm is met." *Id.*, citing *State v. Thomas*, 9th Dist. Summit No. 18881, 1999 WL 76227 (Feb. 17, 1999).

**{¶ 39}** R.C. 2923.11(A) defines a deadly weapon as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." We have held that, in addition to being

capable of inflicting death, the article must have been either designed or specially adapted for use as a weapon or possessed, carried, or used as a weapon. "Either alternative branch of the second requirement can be employed to prove the proposition. When use is a factor, the manner of its use and the nature of the instrument itself determin[e] its capacity to inflict death." *State v. Schooler*, 2d Dist. Montgomery No. 19627, 2003-Ohio-6248, ¶ 21, citing *State v. Deboe*, 62 Ohio App.2d 192, 406 N.E.2d 536 (6th Dist.1977).

> Illustrations of things, innocent in themselves, that may be capable [of] causing death include a baseball bat, a Coke bottle, a toy pistol and an unloaded gun. The statute is not limited to instruments that are dangerous or deadly per se, but includes anything that may be possessed that has an actual or potential danger of serious or deadly harm under the circumstances encountered * * *.

*State v. Clark*, 2d Dist. Clark No. 19627, 1979 WL 208322, *1 (May 23, 1979).

{¶ 40} The record contains sufficient evidence to support Segovia's convictions, and the convictions were not against the manifest weight of the evidence. Gleaves testified that, in the assault by Segovia, he suffered a ruptured spleen, necessitating surgery, and four broken ribs. In addition to Gleaves's testimony about his injuries, the photos of the injuries to his back established serious physical harm. That Gleaves had been newly assaulted, in addition to the previous assault to his face, was readily apparent to Officer Chenoweth, who was able to discern the fresh injuries from the ones inflicted in a prior separate incident. The officers testified that the new injuries were consistent with blunt force trauma. Like a baseball bat, the mop handle was not dangerous per se, but

it was wielded as a weapon by Segovia to inflict injury on Gleaves, including broken bones that required medical treatment.

{¶ 41} While Gleaves did report differing versions of his encounter with Segovia, the jury credited Gleaves's testimony that Segovia used a deadly weapon to inflict serious physical harm, and we defer to the jury's credibility assessment. Gleaves was understandably reluctant to disclose the nature of his relationship with Segovia, and there was testimony that delayed reporting of the details of an offense is a common occurrence among those engaged in illegal activity themselves. The jury reasonably credited Gleaves's testimony.

{¶ 42} Based on the foregoing, Segovia's second assignment of error is overruled.

**Sentencing**

{¶ 43} Segovia's third assignment of error is as follows:

SEGOVIA'S MAXIMUM SENTENCE IS CONTRARY TO LAW.

{¶ 44} Segovia asserts that he was amenable to community control sanctions. He also contends that his sentence is contrary to law because the trial court failed to state at the sentencing hearing that it had considered the principles and purposes of sentencing in R.C. 2929.11 and the sentencing factors listed in R.C. 2929.12. He argues that the trial court appears to have "solely relied upon Segovia's criminal history when it determined its maximum sentence."

{¶ 45} We must apply the standard of review set forth in R.C. 2953.08(G)(2) when reviewing felony sentences, pursuant to which we may increase, reduce, or modify a sentence, or vacate a sentence and remand to the trial court for resentencing, only if we

clearly and convincingly find either: "(1) the record does not support the sentencing court's findings under certain enumerated statutes, or (2) the sentence is otherwise contrary to law." *State v. McCoy,* 2d Dist. Champaign No. 2023-CA-11, 2024-Ohio-98, ¶ 24, citing *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 9, citing R.C. 2953.08(G)(2).

{¶ 46} The trial court was not required to make any findings under the statutes enumerated in R.C. 2953.08(G)(2). As such, we simply consider whether Segovia's sentence is otherwise contrary to law. "A sentence is contrary to law when it does not fall within the statutory range for the offense or if the trial court fails to consider the purposes and principles of felony sentencing set forth in R.C. 29291.11 and the sentencing factors set forth in R.C. 2929.12." *State v. Brown*, 2017-Ohio-8416, 99 N.E.3d 1135, ¶ 74 (2d Dist.).

{¶ 47} " 'The trial court has full discretion to impose any sentence within the authorized statutory range, and the court is not required to make any findings or give its reasons for imposing maximum or more than minimum sentences.' " *McCoy* at ¶ 26, quoting *State v. King*, 2013-Ohio-2021, 992 N.E.2d 491, ¶ 45 (2d Dist.). "Although the trial court must consider R.C. 2929.11 and 2929.12, neither statute requires a trial court to make any specific factual findings on the record." *Id.,* citing *State v. Jones*, 163 Ohio St.3d 242, 2020-Ohio-6729, 169 N.E.3d 649, ¶ 20. " 'It is enough that the record demonstrates that the trial court considered R.C. 2929.11 and R.C. 2929.12 prior to imposing its sentence.' " *Id.,* quoting *State v. Trent*, 2d Dist. Clark No. 2020-CA-61, 2021-Ohio-3698, ¶ 15.

{¶ 48} Finally, "the Supreme Court of Ohio has explained that R.C. 2953.08(G)(2)(b) 'does not provide a basis for an appellate court to modify or vacate a sentence based on its view that the sentence is not supported by the record under R.C. 2929.11 and 2929.12.' " *Id.* at ¶ 27, quoting *Jones* at ¶ 39. "Nothing in R.C. 2953.08(G)(2) permits an appellate court to independently weigh the evidence in the record and substitute its judgment for that of the trial court concerning the sentence that best reflects compliance with R.C. 2929.11 and 2929.12." *Jones* at ¶ 42. "Therefore, when reviewing felony sentences that are imposed solely after considering the factors in R.C. 2929.11 and 2929.12, this court does not analyze whether those sentences are unsupported by the record, but only whether they are contrary to law." *McCoy* at ¶ 27.

{¶ 49} The trial court's judgment entry states that it considered the criteria in R.C. 2929.11 and R.C. 2929.12. As a second-degree felony, Segovia's felonious assault carried a presumption of prison. R.C. 2929.13(D). The stated minimum term imposed was within the statutory range of two, three, four, five, six, seven, or eight years for a felony of the second degree, and the maximum term was properly determined to be the minimum term plus half of the minimum term. R.C. 2929.14(A)(2)(a). Therefore, Segovia's indefinite 8-to-12-year prison term was within the authorized range and not otherwise contrary to law.

{¶ 50} The third assignment of error is overruled.

{¶ 51} The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

WELBAUM, J. and LEWIS, J., concur.