**[Cite as *State v. Coffey*, 2026-Ohio-1210.]**

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 30637 |
| Appellee | : | |
| | : | Trial Court Case No. 25CRB00621 |
| v. | : | |
| | : | (Criminal Appeal from Municipal Court) |
| QUINITA L. COFFEY | : | |
| | : | **FINAL JUDGMENT ENTRY &** |
| Appellant | : | **OPINION** |
| | : | |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on April 3, 2026, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

RONALD C. LEWIS, PRESIDING JUDGE

EPLEY, J., and HUFFMAN, J., concur.

OPINION

MONTGOMERY C.A. No. 30637

CHRIS BECK, Attorney for Appellant
KENT J. DEPOORTER, Attorney for Appellee


LEWIS, P.J.

{¶ 1} Defendant-appellant Quinita L. Coffey appeals from her conviction for domestic violence following a bench trial in the Kettering Municipal Court. For the following reasons, we affirm the judgment of the trial court.

## I.      Facts and Course of Proceedings

{¶ 2} On May 19, 2025, City of Moraine Police Officer Jason Lay filed a criminal complaint in the Kettering Municipal Court alleging that Coffey committed one count of domestic violence, a first-degree misdemeanor, in violation of R.C. 2919.25(A). The allegations involved a May 17, 2025 altercation between Coffey and B.K., the father of Coffey's infant son. Coffey pleaded not guilty.

{¶ 3} A bench trial was held on August 21, 2025. City of Moraine Police Officer Tyera Brown testified first. On May 17, 2025, she was dispatched to Coffey's apartment to assist other police officers relating to a domestic complaint. She spoke with B.K., who told her that he was dropping off his son when an argument ensued and Coffey hit or slapped him. Officer Brown observed a scratch mark on the right side of B.K.'s neck. On cross-examination, Officer Brown stated that B.K. told her that Coffey hit and scratched him.

{¶ 4} B.K. also testified at trial. On May 17, 2025, B.K. returned their son to Coffey at her request. Once he arrived at Coffey's apartment, B.K. started unpacking some of the items he had brought, including a bassinet, a couple of boxes of diapers, and some food. While B.K. set up the bassinet, Coffey began asking him personal questions about where

he was going after he finished at Coffey's place.   He explained to Coffey that his personal life was none of her business because they did not have a relationship other than co-parenting their son.   According to B.K., he did not have an "attitude" during the conversation.   B.K. explained that the following occurred:

> And then she said you can get the f*ck out.   So she kept raising her voice and I said okay fine if you want to kick me out I'm going to walk out.   I walked out.   She followed me out.
>
> . . .
>
> So I left her main door and as soon as you walk out of her main door there is also another -- there is a corridor and then there is another door that takes you outside.   So once I got to the door that takes me outside she grabs my back and starts hitting me and says get your black a*s back inside and put that f*cking sh*t together.
>
> . . .
>
> [S]he starts hitting me from the back and said get your black a*s back inside and put it together.   And I said I'm not going back inside if you're going to keep raising your voice and insulting me while I'm there.   I'm just trying to put a bassinet together and leave.   . . .   She kept arguing with me, hitting me, pulling on my clothes.

Tr. 14-16.   B.K. stated that Coffey slapped him in the face and spat on him.   In response, B.K. "grabbed her hair when she was trying to hit me.   I was trying to use my hands to block her from every time trying to hit me and pushing her away from me."   Tr. 16.   B.K. finally made it into his car but Coffey grabbed the car door, opened it, and kept hitting him and

trying to pull him out of the car. B.K.'s cousin, who accompanied B.K. on the trip to Coffey's apartment, remained in the car during most of B.K.'s altercation with Coffey.

{¶ 5} B.K. tried to drive away while Coffey was hitting him. According to B.K., "she was pulling me out of the driver's seat, hitting me and scratching my neck, spitting on me while I'm trying to make my way out of that parking lot." Tr. 20. B.K.'s cousin got out of the car and Coffey climbed into the passenger seat of the car. B.K. testified that Coffey was "throwing her fists" and just kept hitting him when she was inside the car. Tr. 21. B.K. exited the vehicle and Coffey followed him. B.K. instructed his cousin to get back into the car and drive it away before any further damage was done to the vehicle. Coffey then went into her residence and, shortly thereafter, B.K. heard police sirens approaching. B.K. waited in the parking lot so that he could tell the police his side of the story. He had scratch marks on his neck from Coffey. On cross-examination, B.K. conceded that he pushed Coffey off him "[p]robably twice." Tr. 31.

{¶ 6} City of Moraine Police Officer Jason Lay testified last for the State. When he arrived at Coffey's address on May 17, 2025, he ordered B.K.'s cousin out of the car and handcuffed him because he fit the description of a black male who had been fighting a black female in the parking lot of that address. Coffey told her side of the story to Officer Lay. According to Coffey, there was an argument between B.K. and her because B.K. "had an attitude." Tr. 35. She told him to leave her place. B.K. left but she followed him outside. Coffey told Officer Lay that B.K. pushed her and then she defended herself. Officer Lay noted that Coffey changed part of her story. She originally stated that there was no physical altercation between B.K. and her by the driver's side door but later admitted that there was. Officer Lay noticed some damage to the car at the scene. Officer Lay identified the following issue he had with Coffey's version of events:

4

The way that it was described to me didn't match with the damage that I was observing. And her story, because of the driver's side damage to the vehicle like where the door looked like it had been opened wider, her story was very I would characterize it as disjointed. It wasn't following like an A, B, C pattern of sequence of events. And she later did contradict herself about the incident.

Tr. 38-39. Officer Lay did not notice any physical injuries to Coffey when he interviewed her. On cross-examination, Officer Lay confirmed that Coffey told him that B.K. had shoved her, slapped her, and dragged her out of his car.

{¶ 7} Officer Lay also talked to B.K. about his version of what happened. According to Officer Lay, B.K. said he left Coffey's apartment and she followed him and began hitting and slapping him. She blocked his entrance to his car and kept slamming the door shut when he opened it. B.K. eventually was able to get into the car by grabbing Coffey's shoulders and moving her away from the door. Once he got into the car, Coffey got in the way of the door so that he could not shut it. While B.K. was in the car, Coffey slapped and pulled him. Coffey eventually made her way across B.K. into the passenger seat of the car. A short video taken by B.K.'s cousin showed her in the car. Officer Lay testified that B.K. had a small scratch on the right side of his neck and the neck of his shirt was stretched.

{¶ 8} Coffey testified in her own defense. According to Coffey, she began dating B.K. in May 2024. They have never been married and Coffey found out on August 31, 2024, that she was pregnant. She asked B.K. to watch their son the weekend of May 17, 2025, but then asked B.K. to bring their son back to her a day early, which B.K. did. When B.K. arrived, he unloaded a bassinet and a few other things and placed them outside her door. She asked him to bring them inside and he did. B.K. then asked if he could set up the bassinet and Coffey told him that was fine. According to Coffey, B.K. started to develop

5

an attitude after Coffey told him that she did not have a screwdriver, and she asked him whether he was going out that night. B.K. left her place before he finished the bassinet and when Coffey followed him outside to ask him to finish assembling the bassinet, he turned around, called her a "sick a*s b*tch," and "with his hand openly mugged [her] to the ground." Tr. 60. Coffey explained that "mugged" meant B.K. was using his whole hand to slap Coffey to the ground. She then got up and he "mugged" her again. Coffey testified that she swung back at B.K. to protect herself. Coffey stated that B.K. "mugged" her to the ground four or five times and pulled her hair during the 10-15 minutes in which the physical altercation occurred. B.K. demanded that Coffey sit in his car while they talked. B.K. and his cousin then started speaking a different language, B.K.'s cousin dragged Coffey out of the car, and they tried to drive away. B.K. ran his car into a neighbor's car and while he was examining the damage, Coffey ran inside her home and called the police.

{¶ 9} On cross-examination, Coffey testified that there was no physical altercation by the driver's side door before she got into B.K.'s car. She also stated that Officer Lay was lying when he testified that she did not have any injuries at the time Officer Lay questioned her. Coffey indicated that she had "drag burns from the concrete" on her arm. Tr. 75.

{¶ 10} At the conclusion of the trial, the court found Coffey guilty of domestic violence. The court sentenced Coffey to 180 days in jail but credited her for the 7 days she had already served and suspended the remaining 173 days. The trial court also placed her on a term of 2 years of supervised probation. Coffey filed a timely notice of appeal.

II. **Coffey's Conviction Is Supported by Sufficient Evidence and Is Not Against the Manifest Weight of the Evidence**

{¶ 11} Coffey's two assignments of error state:

6

THE STATE PRESENTED INSUFFICIENT EVIDENCE TO PROVE EVERY ESSENTIAL ELEMENT OF DOMESTIC VIOLENCE O.R.C. 2919.25 AND ASSAULT, O.R.C. 2903.13 BEYOND A REASONABLE DOUBT.

APPELLANT'S CONVICTION FOR DOMESTIC VIOLENCE WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 12} Whether the evidence presented at trial is legally sufficient to sustain a conviction is a question of law that an appellate court reviews de novo. *State v. Groce*, 2020-Ohio-6671, ¶ 7, citing *In re J.V.*, 2012-Ohio-4961, ¶ 3. "To resolve a sufficiency challenge, we must determine 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. McKelton*, 2016-Ohio-5735, ¶ 325, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. An appellate court does not engage in a determination of witnesses' credibility when reviewing the sufficiency of the evidence. *State v. Goff*, 82 Ohio St.3d 123, 139 (1998), citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Nor does an appellate court assess whether the evidence admitted at trial should be believed but, rather, if believed, whether the evidence "would convince the average mind of the defendant's guilt beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus. "We will not disturb the verdict unless we find that reasonable minds could not reach the conclusion reached by the trier of fact." *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001), citing *Jenks* at 273.

{¶ 13} In contrast to a sufficiency challenge, the weight of the evidence concerns the inclination of the greater amount of credible evidence offered to support one side of the issue rather than the other. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), citing *Black's Law Dictionary* (6th Ed. 1990). "A reviewing court considering a manifest-weight claim

'review[s] the entire record, weighs the evidence and all reasonable inferences, [and] considers the credibility of witnesses.'" *State v. Group*, 2002-Ohio-7247, ¶ 77, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A case should be reversed as being against the manifest weight of the evidence "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175.

{¶ 14} Coffey was convicted of domestic violence in violation of R.C. 2919.25(A), which provides, "No person shall knowingly cause or attempt to cause physical harm to a family or household member." A "family or household member" includes "[t]he natural parent of any child of whom the offender is the other natural parent or is the putative other natural parent." R.C. 2919.25(F)(1)(b). Coffey argues that there was insufficient evidence to support her conviction because the State failed to prove beyond a reasonable doubt that Coffey caused any physical harm. Coffey also argues that the manifest weight of the evidence does not support her conviction because the State failed to prove that she knowingly caused or attempted to cause physical harm and that any physical harm was committed. We do not agree.

{¶ 15} The testimony of B.K. and Officers Lay and Brown, if believed, provided sufficient evidence to support the domestic violence conviction. Their testimony established that Coffey was the initial aggressor and hit B.K., the father of her infant son, several times. It is undisputed that B.K. had a scratch on his neck from Coffey hitting him. The only dispute was over who was the initial aggressor. After viewing the evidence in a light most favorable to the State, any rational trier of fact could have found domestic violence proven beyond a reasonable doubt. Therefore, Coffey's conviction for domestic violence is supported by sufficient evidence.

{¶ 16} We also conclude that Coffey's domestic violence conviction is not against the manifest weight of the evidence. The undisputed evidence at trial established that B.K. suffered physical harm because of the physical altercation with Coffey. Further, the testimony of B.K. and Officer Lay supported the fact that Coffey was the initial aggressor in the altercation that resulted in physical harm to B.K. Officer Lay identified inconsistencies in Coffey's story that led him to this conclusion. B.K.'s testimony highlighted these inconsistencies and supported the domestic violence conviction. At the conclusion of the bench trial, the trial court credited the testimony of Officer Lay and B.K. over the testimony of Coffey. "The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 1997 WL 476684, *4 (2d Dist. Aug. 22, 1997). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2014-Ohio-3432, ¶ 24 (2d Dist.), citing *State v. Wilson*, 2009-Ohio-525, ¶ 14 (2d Dist.). "This court will not substitute its judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict." *State v. Segovia*, 2024-Ohio-1392, ¶ 36 (2d Dist.), citing *State v. Bradley*, 1997 WL 691510, *4 (2d Dist. Oct. 24, 1997). Based on our review of the evidence presented at trial, we cannot conclude that the trial court lost its way in arriving at its verdict or that this is the exceptional case in which the evidence weighs heavily against the conviction.

{¶ 17} The assignments of error are overruled.

III. Conclusion

{¶ 18} Having overruled the assignments of error, we affirm the judgment of the trial court.

9

. . . . . . . . . . . . .

EPLEY, J., and HUFFMAN, J., concur.